THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM EPHRAIM, Defendant-Appellant.

First District (5th Division)  Nos. 1—99—0836, 1—99—1267 cons.

Opinion filed June 29, 2001.—Rehearing denied August 8, 2001.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant William Ephraim (defendant) was convicted by a jury of two counts of attempted first degree murder and two counts of aggravated battery with a firearm. On the two counts of attempted first degree murder, defendant was sentenced to two 20-year terms of imprisonment to be served consecutively. We affirm.

In the late afternoon on April 10, 1996, Asiah Vance and her aunt, Halimah Muhammed, were on the front porch of Muhammed's house

at 5125 South Laflin in Chicago, Illinois, watching their children play. While sitting on the porch, Vance heard two cars speeding down the street and approximately 10 gunshots, so she ran into the house with her two-year-old daughter, Tiara Moren. When she got inside the house, she realized her daughter had been shot.

Muhammed testified that she was standing on the bottom stair of the front porch when she heard approximately three or four gunshots. She immediately began gathering up the children and ran inside. When she got inside, she realized that her four-year-old son, Andrew White, had been shot.

At the time of the shooting, Terrice Hartfield, who lived next door to Muhammed, was washing his car in front of his house. Upon hearing the gunshots, Hartfield dove to the ground in front of his car. He does not recall the make of the first car to pass him, but he does remember that it was white. As for the second car, Hartfield identified it as a white Pontiac Grand Prix with a gray bottom.

Benjamin Navarro, who also lives on Laflin, was in the alley throwing out his garbage when the shooting occurred. He remembers hearing gunshots and then seeing a white Pontiac Grand Prix race toward him. The Grand Prix stopped in the alley while the driver threw an object out the window. According to Navarro, the driver, a black male, was the only person in the car. The car did not have license plates but did have an orange sticker in the back window. On April 17, 1996, Navarro identified the car in the police department parking lot. However, after viewing a lineup, Navarro was unable to identify the driver.

On the day of the shooting, Chicago police detective John Halloran arrived at the scene and could not find any physical evidence connected with the shooting. While at the crime scene, Halloran spoke with Nicole and Antoinette Muhammed, the 16-year-old sisters of Andrew White. Nicole Muhammed told Halloran that she was sitting on her porch at the time of the shooting and saw a black, four-door car with gold rims chase another vehicle northbound down Laflin. Nicole Muhammed said the gunman was sitting in the backseat of the car and was shooting randomly out of the back passenger window. According to Nicole Muhammed, her boyfriend, Jason Miller, and Anthony Branch witnessed the shooting from across the street from her house.

Antoinette Muhammed told Halloran that she too observed a black, four-door car with gold rims chase another car northbound down Laflin. According to her recollection of the shooting, the shooter was in the front passenger seat sitting on the window ledge with his upper body outside of the car while he shot a gun in a forward direction.

Next, Halloran spoke with Jason Miller and Anthony Branch. They both told Halloran that from the porch of Miller's house they observed a black, four-door car with gold rims chase another car down Laflin. Miller and Branch recall that the shooter was in the black car. They identified the shooter as Eric, a member of the Black P Stones Gang, who lives at 51st and Paulina.

At trial, Halloran testified that the area where the shooting occurred is controlled by the Black P Stones street gang. Further, Halloran stated that both Miller and Branch are members of the Black P Stones gang. Halloran testified that he knew of a person named Eric Gibson who did in fact live on the block claimed by Miller and Branch. Halloran showed Miller and Branch a photograph of Eric Gibson, and they both identified him as the shooter. Moreover, the police located a dark blue, four-door car with gold rims and Miller and Branch identified this car as the one driven by Eric Gibson when the shooting occurred.

Halloran testified that Nicole and Antoinette Muhammed, as well as Miller and Branch, viewed a lineup. Miller and Branch both identified Eric Gibson as the shooter, but Nicole and Antoinette Muhammed did not. Halloran was concerned over the information he received from Nicole and Antoinette Muhammed, Miller, and Branch because their accounts of the shooting varied significantly from the accounts of others who also witnessed the shooting.

In an effort to reconcile the varying witness accounts Halloran received, he interviewed Miller and Branch for a second time. They both admitted that they lied when they not only identified the dark blue car, but also when they identified Eric Gibson as the shooter. Halloran testified that Branch went so far as to say that Eric Gibson was not even present at the shooting. When Nicole and Antoinette were confronted with the fact that Miller and Branch had recanted, they refused to speak to the police any further.

Halloran testified that in the course of his investigation he learned the nickname of an individual possibly involved in the shooting and his gang affiliation. More specifically, Halloran learned that a Black P Stones gang member called "Big Man" might be involved in the shooting. In court, Halloran identified Big Man as the defendant.

Halloran first spoke with defendant after he was taken into custody. After Halloran advised defendant of his rights, defendant agreed to speak with him and initially denied any knowledge about the shooting. However, defendant did admit to Halloran that he is known as Big Man and is a member of the Black P Stones gang.

Eventually, defendant told Halloran about his involvement in the shooting. According to Halloran, defendant told him that at the time

of the shooting he was on the corner of 53rd Street and Laflin playing dice with fellow gang members. While playing dice, defendant saw a gray, two-door car drive northbound down Laflin. As the gray car passed, one of defendant's fellow gang members yelled out for someone to "get on that car," since the driver was a rival gang member. Another member of the gang, known as both "Percy" and "Verge," ran to his car to retrieve a gun and began shooting at the gray car while standing in the middle of the street. Halloran testified that defendant then stated that he jumped into his white Pontiac Grand Prix, unaccompanied by any fellow gang members, and began chasing the gray car. Halloran stated that defendant admitted that he was armed with a .32-caliber revolver that he fired with his left hand at the gray car out of the driver's side window. When he reached the 5100 block of Laflin, defendant fired additional shots at the gray car and then turned down the alley located at approximately 5207 Laflin, where he threw his gun out the window. Defendant told Halloran that he thinks a Mexican man in the alley may have seen him throw away the gun. Defendant then returned to 53rd and Laflin.

Assistant State's Attorney Don Lyman testified that he was at the police station where Eric Gibson was in custody. After speaking with Nicole and Antoinette Muhammed, Miller, and Branch, Lyman confronted Branch with the inconsistencies in their accounts of the shooting. Branch then admitted that it was not Eric Gibson he had seen at the shooting and refused to speak any further with Lyman. When Lyman confronted Miller with the inconsistencies in their accounts, Miller admitted that he saw a white, two-door car chase another car north down Laflin. Further, Lyman testified that Miller told him that he heard gunshots and recognized the driver of the white car as Big Man.

Miller testified at trial that he is a former member of the Blackstones street gang. Miller stated that at the time of the shooting he was dating Nicole Muhammed and knew the defendant as "Big Shorty." Miller was sitting on the front porch of his house, which is directly across the street from the Muhammeds' house, when the shooting occurred. Miller remembers seeing two cars come down the street and hearing about five or six gunshots. According to Miller, the police forced him to say that one of the vehicles he saw was a gray, four-door car and that the other was black with gold wheels. Miller admitted that he told the police that he saw Eric Gibson shooting a gun out of the passenger side window of the black car. However, Miller testified that he did not recall telling Lyman that he saw Big Man driving a white, two-door car while chasing another vehicle. In fact, Miller denied ever seeing Big Man drive a white car down his street.

When asked if he recalled giving previous testimony in this case in July of 1997, Miller responded in the affirmative. When asked if he remembered testifying that he saw a gray, four-door car followed by a white car driven by Big Shorty, Miller replied, "I guess." Miller testified that the police told him that they were going to charge him with the shooting, and, consequently, he gave the police a false account of what took place. Miller denied knowing anyone by the name of Eric Gibson. According to Miller, he was not a friend of the defendant's and had no reason to protect him.

Police Officer Thomas Glynn testified that on April 16, 1996, he observed defendant driving a white, two-door vehicle with an orange sticker in the rear window. Officer Glynn pulled defendant over and recalls defendant telling him that his nickname is Big Man. Officer Glynn also testified that he learned the car defendant was driving was registered to his mother, Mary Williams.

Assistant State's Attorney Dan Weiss testified that he interviewed defendant after his arrest and defendant admitted to him that he is a member of the Blackstone street gang and that he is frequently in the area of 53rd Street and Laflin. Defendant told Weiss that on April 10, 1996, while he was playing dice on the corner of 53rd Street and Laflin, he and Percy were ordered by another gang member to stop the car of a rival gang member which was proceeding northbound down Laflin. Percy immediately retrieved a gun from his car and fired at the gray, four-door car as it sped down the street. Defendant jumped into his car and began following the gray car while he simultaneously fired a .32-caliber gun out the driver's side window. According to Weiss, defendant said that he fired two additional shots when he was between 52nd Street and 51st Street. Defendant remembers seeing children on the street when he fired the gun and throwing the gun out somewhere around the 5200 block.

Mary Williams, defendant's mother, was the only witness to testify on behalf of defendant. Williams testified that in April of 1996, she worked three days a week from 9 a.m. to 9 p.m. as a cashier at a dollar store located at 65th Street and Ashland. Defendant also worked at the store, usually in the late afternoon or evenings, on an "as needed" basis. On the day of the shooting, Williams remembers asking her boss, Patricia Hodges, to pick her son up from school. Williams testified that her son then worked at the store with her from 3 p.m. until 7 p.m. At the time of trial, Williams stated she was no longer in touch with Hodges and did not know where she was living. Williams testified that the Pontiac Grand Prix her son was seen driving belonged to her, but many of her family members had a set of keys to the car and were freely permitted to use it. According to Williams, on the day of the shooting, her sister had the car.

At the close of the trial, the jury found defendant guilty of both counts of attempted first degree murder and both counts of aggravated battery with a firearm. Defendant's motion for a new trial was denied.

At the sentencing hearing, Patricia Hodges testified on defendant's behalf. She testified that, on the day of the shooting, she picked defendant up from school and brought him to the dollar store where he worked from 3 p.m. to 7 p.m. However, Hodges did admit that on the day of the shooting she was in and out of the store all day. When asked why she failed to comply with her subpoena to appear in court to testify on behalf of defendant at trial, Hodges stated she could not recall.

On the two counts of attempted first degree murder, defendant was sentenced to two consecutive terms of 20 years in the Illinois Department of Corrections. Defendant appeals his conviction and sentence.

The issues presented for review are whether the trial court's decision to deny defendant's request to excuse two jurors for cause was against the manifest weight of the evidence; whether the doctrine of transferred intent is applicable to defendant's convictions for attempted murder where the unintended victims were not killed; whether the State failed to prove beyond a reasonable doubt that defendant committed attempted first degree murder; whether the cause must be remanded for a further posttrial hearing, where the trial court failed to *sua sponte* examine an allegation of ineffective assistance of counsel; and, lastly, whether *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), applies to the instant matter where the trial court imposed mandatory consecutive sentences pursuant to section 5—8—4(a) and section 5—8—4(h) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a), (h) (West 1998)).

Defendant contends that when a juror expresses doubt about his ability to be impartial, he should be excused for cause. In the case at bar, defendant argues that two jurors, Louise Talabar and Jean Hicke, expressed self-doubt as to whether they could be impartial. Defendant had exhausted all of his peremptory challenges and asked the court to excuse Talabar and Hicke for cause. The trial judge denied defendant's request. The State contends that Talabar and Hicke indicated to the court that they would be impartial, and, therefore, the trial court properly denied defendant's request to excuse them for cause.

●1 "The determination of whether a prospective juror is biased is within the sound discretion of the trial judge, whose decision will not be reversed unless it is against the manifest weight of the evidence." *People v. Reid*, 272 Ill. App. 3d 301, 307 (1995), citing *People v. Cole*, 54 Ill. 2d 401, 414 (1973). The juror's entire *voir dire* examination

must be considered when determining whether a trial court's ruling on a challenge for cause was proper. *People v. Buss*, 187 Ill. 2d 144, 187 (1999), citing *People v. Williams*, 173 Ill. 2d 48, 67 (1996). The party claiming that a juror has a disqualifying state of mind has the burden of showing the actual existence of this state of mind in the juror so as to raise the " 'presumption of partiality.' " *Reid*, 272 Ill. App. 3d at 307, quoting *Cole*, 54 Ill. 2d at 413. However, the Illinois Supreme Court has held:

> "While a prospective juror may be removed for cause when that person's 'views would prevent or substantially impair the performance of his duties as a juror [citation], an equivocal response does not require that a juror be excused for cause." *Buss*, 187 Ill. 2d at 187, citing *Williams*, 173 Ill. 2d at 67.

Moreover, "[a]n equivocal response by a prospective juror does not necessitate striking the prospective juror for cause where the prospective juror later states that he will try to disregard his bias." *People v. Hobley*, 159 Ill. 2d 272, 297 (1994), citing *People v. Tipton*, 222 Ill. App. 3d 657, 664 (1991).

●2 A complete examination of Talabar's *voir dire* examination shows that the trial court did not abuse its discretion in finding that there was no need to excuse Talabar for cause. In regard to whether Talabar had ever been the victim of a crime, she merely stated that "years ago" her home had been burglarized. She also noted that her brother had been killed by a negligent truck driver and that it bothers her that adolescents jeopardize their future by joining gangs. However, Talabar went on to state that she would like to think that she would have "the intelligence to be fair and make the correct decision." Talabar further stated that she would "weigh everything." Lastly, although Talabar expressed some agitation after having been told by the trial judge that the evidence will show that two young children were injured, she stated that she would sign a guilty verdict only if the defendant was proven guilty beyond a reasonable doubt. Talabar's statements, when viewed as a whole, indicate that she would keep a fair and open mind when evaluating the evidence. For this reason, the trial court's decision to deny defendant's request to excuse Talabar for cause was not against the manifest weight of the evidence.

●3 Similarly, the trial court's denial of defendant's request to excuse Hicke for cause was not against the manifest weight of the evidence. When asked whether evidence involving the children's injuries and gangs would affect her ability to be fair, Hicke stated that she thought she could "weigh the evidence on both sides and come to a conclusion." At one point in her *voir dire* examination, Hicke misstated the burden of proof when she stated that she would not hold it

against the defendant if he did not put on any evidence so long as the State found defendant not guilty. Hicke's understanding of the law was immediately clarified. Hicke was asked whether she understood that the State's duty was to put on witnesses so that the jury could act as the judge. To this question, Hicke responded affirmatively. Furthermore, Hicke stated that she would not hold anything against defendant if he did not put on any evidence. The totality of Hicke's responses indicate that she would keep a fair and open mind in weighing the evidence. Consequently, it is clear that, in denying defendant's request to excuse Hicke for cause, the trial court's decision was not against the manifest weight of the evidence.

●4 Defendant cites to *People v. Johnson*, 215 Ill. App. 3d 713, 725 (1991), for the proposition that where a juror expresses self-doubt about being impartial, reversal is required. *Johnson* is easily distinguishable from the case at bar. In *Johnson* the appellate court stated that the jurors should have been excused for the following two reasons:

> "Mr. Milkovich, Mr. Welch, and Mr. Swope were crime victims or they had close friends or relatives who were victims of violent crimes. In addition, they equivocated when first asked whether they could be fair and impartial. For these reasons, they should have been dismissed for cause." *Johnson*, 215 Ill. App. 3d at 725.

From this excerpt it is clear that the *Johnson* court found it significant that each of these three prospective jurors had himself been a crime victim or had close friends and relatives who were victims of violent crimes. The jurors were not excused only because they equivocated when asked if they could be fair and impartial. In *Johnson*, Michael Milkovich told the court that his family had been victims of a robbery committed by his cousin and that his sister "was involved in armed robbery, in robbery [and] drugs in Hammond." *Johnson*, 215 Ill. App. 3d at 717. Richard Welch testified that he and all of his close friends and relatives had been victims of violent crimes. For instance, Richard Welch stated that he had been robbed at knifepoint and that his friends had been burglarized, one of them being beaten by the assailant. *Johnson*, 215 Ill. App. 3d at 717. Raymond Swope testified that he had been robbed, his car had been stolen, and that his mother and wife had been raped. *Johnson*, 215 Ill. App. 3d at 717. The violent crimes experienced by the prospective *Johnson* jurors are significantly more grave than those experienced by Talabar and Hicke. The appellate court in *Johnson* was justified in finding that prospective jurors' equivocal responses, coupled with their exposure to violent crimes, were a valid basis for excusing them. Since the experiences of Talabar and Hicke are dissimilar from those experienced by the prospective jurors in *Johnson*, we find that *Johnson* is not applicable to the case at bar.

●5 Next, defendant contends that pursuant to *People v. Reinbold*, 247 Ill. App. 3d 498 (1993), Talabar and Hicke should have been excused. In *Reinbold*, the appellate court found that the trial court should have excused a prospective juror who stated that she would like the defendant to prove his innocence. *Reinbold*, 247 Ill. App. 3d at 504. In the case at bar, Talabar did not express any confusion regarding the burden of proof or whether the defendant was required to present evidence in his defense. Moreover, Hicke stated that she would not hold it against the defendant if he did not put on any evidence. Since neither Talabar nor Hicke stated that defendant should be required to prove his innocence, *Reinbold* is also inapplicable to the case at bar.

●6 Defendant asserts that *People v. Pendleton*, 279 Ill. App. 3d 669 (1996), is instructive on the issue of when a prospective juror should be excused. In *Pendleton*, the defendant argued that his due process rights under the Illinois Constitution were violated when the defense had to use two of its peremptory challenges to strike prospective jurors that should have been excused for cause. *Pendleton*, 279 Ill. App. 3d at 674. The appellate court held that the two prospective jurors at issue in *Pendleton* should have been excused since the totality of their *voir dire* examinations indicated that they could not be impartial. However, the court held that there are no "grounds for reversal where the defendant used peremptory challenges on venire members the trial court should have dismissed for cause, unless the defendant exhausted all of his peremptory challenges and an objectionable juror sat on the jury." *Pendleton*, 279 Ill. App. 3d at 677. One of the prospective jurors in *Pendleton* "expressed her belief that she would have a difficult time presuming defendant was innocent because she believed that once a case has come as far as a trial, the defendant is probably guilty." *Pendleton*, 279 Ill. App. 3d at 674. Although, ultimately the prospective juror stated that she could apply the presumption of innocence, the appellate court found that complete review of her *voir dire* examination showed her "inability to hold the State to its burden of proving defendant's guilt beyond a reasonable doubt." *Pendleton*, 279 Ill. App. 3d at 674. The entire *voir dire* examination of another prospective juror revealed that she was a victim of an assault involving a gun being placed to her head. Based on this experience, she expressed doubt regarding whether she could be fair in a case involving a gun. *Pendleton*, 279 Ill. App. 3d at 674-75. The appellate court found that "[t]he trial court's attempts to rehabilitate Ms. Reed could not erase Ms. Reed's experience as a serious crime victim." *Pendleton*, 279 Ill. App. 3d at 675. In the case at bar, the *voir dire* examinations of Talabar and Hicke do not resemble those of the prospective jurors in *Pendleton*.

Talabar and Hicke showed only minor equivocation and were immediately rehabilitated. As a result, *Pendleton* is not applicable to the case at bar.

In the case at bar, a complete examination of Talabar's and Hicke's *voir dire* examinations indicates that they would keep a fair and open mind when evaluating the evidence at trial. Talabar and Hicke expressed only slight equivocation and were immediately rehabilitated. In light of the totality of Talabar's and Hicke's *voir dire* examinations, we find that trial court's decision to deny defendant's request to excuse Talabar and Hicke for cause was not against the manifest weight of the evidence.

●7 Next, defendant contends that the doctrine of transferred intent is not applicable where the unintended victims were not killed. It is readily apparent that defendant did not intend to shoot and injure two young children. The State and defendant agree that defendant was intending to shoot the driver of the gray, four-door vehicle. Since there are no factual issues in dispute, the legal issues can be reviewed *de novo. People v. Garriott*, 253 Ill. App. 3d 1048, 1050 (1988).

Defendant contends that where an individual is prosecuted for attempted murder and the unintended victims are not killed but only injured, the doctrine of transferred intent is not applicable to the unintended victims. In support of his argument, defendant cites to *Harvey v. State*, 111 Md. App. 401, 681 A.2d 628 (1996), a Maryland case. In light of this proposition, defendant argues that since the children were not killed the doctrine of transferred intent is not applicable. Without the application of transferred intent, defendant claims that the evidence was insufficient to show that he intended to kill the children. Consequently, defendant claims that his convictions for attempted murder must be vacated and the cause remanded for resentencing since the State failed to prove that defendant is guilty beyond a reasonable doubt.

We find defendant's argument unpersuasive. It is well established that in Illinois the doctrine of transferred intent is applicable to attempted murder cases where an unintended victim is injured. Since the law is so well established in Illinois, there is no need for this court to turn to Maryland law. Moreover, the evidence presented at trial clearly establishes defendant's guilt beyond a reasonable doubt.

In *People v. Hill*, 276 Ill. App. 3d 683, 691 (1995), this court stated that the doctrine of transferred intent "remains alive and well." In *Hill*, this court found that the jury properly determined that the defendants had the specific intent to kill Jose Tanon and, therefore, held that the defendants' intent to kill Jose transferred to Elizabeth Perez when the bullet missed Jose and hit Elizabeth in the leg. *Hill*, 276 Ill. App. 3d at 689.

In *People v. Swaney*, 2 Ill. App. 3d 857, 859 (1971), the defendant argued that he intended to kill only Vladmir Chuk and not his wife, Sophie Chuk. On appeal, the defendant argued that "there was no evidence of intent to kill or harm Mrs. Chuk, maintaining that a person who, while assaulting another with intent to kill him, unintentionally injures a third person cannot be guilty of intent to kill the third person." *Swaney*, 2 Ill. App. 3d at 858. The appellate court found that the evidence introduced at trial showed that the defendant "invaded the home of the Chuk's [*sic*] for a criminal purpose while armed with a hunting knife which he used indiscriminately in the darkness." *Swaney*, 2 Ill. App. 3d at 859. Since the evidence introduced was sufficient to prove all elements of attempted murder, the appellate court held that the jury was justified in finding that the defendant was guilty beyond a reasonable doubt. *Swaney*, 2 Ill. App. 3d at 859.

In *People v. Burrage*, 269 Ill. App. 3d 67, 76 (1994), this court found that the evidence showed that one of the defendants, Rozene Burrage, had the intent to kill an individual named Andre, but she actually shot an innocent three-year-old child, and under the doctrine of transferred intent, the court held that the defendant's intent to kill Andre was transferred to the three-year-old child. *Burrage*, 269 Ill. App. 3d at 76.

Accordingly, it is clear that the doctrine of transferred intent applies to situations where the victim is injured rather than killed. Therefore, in the case at bar, where the young victims were injured rather than killed, we hold that the doctrine of transferred intent is applicable.

Defendant asserts that the State failed to prove beyond a reasonable doubt that he committed first degree attempted murder. At best, defendant contends that the evidence presented at trial established that he intended to get "on that car," meaning that he merely intended to stop the car he was chasing and beat the driver. More specifically, defendant is arguing that the evidence failed to show that he had the specific intent to kill the driver. The State contends that evidence showed that defendant chased the driver of the gray vehicle and fired at least three shots at him from a deadly weapon. Based on this evidence, the State argues that it proved beyond a reasonable doubt that defendant specifically intended to kill his rival gang member.

•8 The Illinois Supreme Court has held that "[a] criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is not the appellate court's duty to retry the case. Rather, we are to view the evidence in the light most favorable to the prosecution and determine whether

any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Collins*, 106 Ill. 2d at 261, citing *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is the jury's duty to determine whether the defendant specifically intended to kill his victim. *People v. Starks*, 190 Ill. App. 3d 503, 510 (1989). The verdict will not be reversed unless it is against the manifest weight of the evidence. *Starks*, 190 Ill. App. 3d at 510, citing *People v. Nicholls*, 42 Ill. 2d 91, 95 (1969).

●9 This court has held that "[a]lthough the intent to kill can be transferred, it must still be proven beyond a reasonable doubt." *People v. Homes*, 274 Ill. App. 3d 612, 623 (1995). In order for the State to obtain a conviction of attempted murder, a specific intent to kill must be proven beyond a reasonable doubt. *Homes*, 274 Ill. App. 3d at 622, citing *People v. Jones*, 81 Ill. 2d 1, 9 (1979); *People v. Harris*, 72 Ill. 2d 16, 27 (1978); *People v. Myers*, 83 Ill. App. 3d 1073, 1076 (1980). The intent to kill is a state of mind which, if not readily admitted, can be proven by presenting evidence of the surrounding circumstances and the character of the assault, including "the use of a deadly weapon [citation], and the firing of a gun at or towards another person with either malice or a total disregard for human life." *Homes*, 274 Ill. App. 3d at 622-23, citing *People v. Strickland*, 254 Ill. App. 3d 798, 808 (1993); *People v. Starks*, 190 Ill. App. 3d 503, 510 (1989). However, evidence that the defendant fired a gun, coupled with nothing more, is generally not sufficient to prove a specific intent to kill. *Homes*, 274 Ill. App. 3d at 622. The specific intent to kill may be inferred so long as the surrounding circumstances show that the defendant intended the wilfully committed act, "the direct and natural tendency of which is to destroy another's life." *People v. Migliore*, 170 Ill. App. 3d 581, 586 (1988), citing *People v. Coolidge*, 26 Ill. 2d 533, 537 (1963). "The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978), citing *People v. Munoz*, 44 Ill. App. 3d 339 (1976).

●10 In the case at bar, defendant's intent to kill the driver of the four-door, gray vehicle can be inferred from the surrounding circumstances. At trial, Assistant State's Attorney Weiss testified that defendant was ordered by a fellow gang member to get "on that car," "that" being the car of the rival gang member. In response to this order, defendant admitted to jumping into his own car and chasing the gray, four-door vehicle while firing three shots at the gray car. Regardless of whether an order to get "on that car" means to simply beat the driver or kill the driver, three undisputed facts remain: (1) defendant chased

the gray car, (2) defendant believed the driver to be a rival gang member, and (3) defendant fired multiple shots at the gray vehicle. Rival gang members are considered enemies. Further, defendant was chasing a person whom he assumed to be a rival gang member. These two facts, coupled with defendant's act of firing a gun, make it feasible for the jury to conclude that defendant intended to kill the driver of the gray car. Thus, in viewing the facts in the light must favorable to the State, we find that it was not unreasonable for the jury to have found that defendant possessed the specific intent to kill.

Defendant claims that the trial court was obligated, *sua sponte*, to hold a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), in an effort to determine whether defendant's trial counsel was incompetent. More specifically, defendant asserts that his trial counsel failed to present the testimony of alibi witness Patricia Hodges, who was listed in defendant's answer to discovery. Defendant argues that the trial court should have appointed independent counsel to represent defendant at a hearing on ineffective assistance of counsel even though defendant never explicitly alleged that his trial counsel was ineffective. Since Hodges was presented as a witness only at defendant's sentencing hearing, defendant contends that we should remand the matter for posttrial proceedings on counsel's ineffectiveness.

In *Krankel*, after trial, the defendant filed a *pro se* motion for a new trial alleging that defense counsel failed to introduce the defense of alibi and failed to investigate the defendant's whereabouts at the time the crime was committed. *Krankel*, 102 Ill. 2d at 183. The Illinois Supreme Court noted that, in their briefs, both the State and the defendant's trial counsel agreed that the "defendant should have had counsel, other than his originally appointed counsel, appointed to represent him at the posttrial hearing in regard to the allegation that he had received ineffective assistance of counsel." *Krankel*, 102 Ill. 2d at 189. The Illinois Supreme Court agreed with the defendant and the State and, therefore, remanded the matter for a new hearing on defendant's motion for a new trial with appointed counsel other than his originally appointed counsel. *Krankel*, 102 Ill. 2d at 189. Thus, the crux of *Krankel* is that a defendant's attorney cannot argue a motion, on behalf of the defendant, where the defendant is claiming that his attorney was ineffective. To alleviate any potential bias, independent counsel must be appointed.

In *People v. Jackson*, 131 Ill. App. 3d 128, 137-38 (1985), the defendant and his attorney appeared in court for the dual purposes of hearing the defendant's posttrial motion and holding the sentencing hearing. However, prior to appearing in court on this day, the defendant wrote a letter to the trial judge in which he complained that he

had not been effectively represented by his trial attorney. *Jackson*, 131 Ill. App. 3d at 138. In his letter to the trial judge, the defendant alleged that his attorney failed to call an alibi witness, the defendant's doctor, to testify at trial. The defendant wanted his doctor called to the witness stand in order to testify that, at the time of the offense, defendant was in the doctor's office. Moreover, the defendant believes that his doctor would have testified that due to his lack of physical strength, defendant could not have stolen the television and microwave because he could not lift them. *Jackson*, 131 Ill. App. 3d at 140. When confronted with this allegation, the defendant's attorney told the trial judge that defendant's doctor was not called because after he interviewed the doctor and his office staff he learned that the defendant could not be placed at the witness' place of business at any relevant time. *Jackson*, 131 Ill. App. 3d at 138. Further, the defendant's trial counsel stated that any testimony regarding the defendant's physical condition would have been cumulative evidence. *Jackson*, 131 Ill. App. 3d at 138.

On appeal, the defendant argued that "where a defendant, in a post-trial motion, alleges the ineffective assistance of trial counsel, new counsel generally should be appointed for the purpose of conducting the hearing." *Jackson*, 131 Ill. App. 3d at 138. This court held that a defendant's right to independent counsel is not a *per se* rule. *Jackson*, 131 Ill. App. 3d at 138. In determining whether the defendant is entitled to independent counsel after complaining, during posttrial proceedings, that his trial counsel was ineffective, the *Jackson* court held that the objective test set forth in *People v. Johnson*, 98 Ill. App. 3d 28 (1981), should be applied. Pursuant to *Johnson*, independent counsel should not be appointed if "defendant's claim is spurious or revolves simply around a matter of trial strategy or tactics." *Jackson*, 131 Ill. App. 3d at 139. However, independent counsel should be appointed if the facts show that the defendant's case may have been neglected. *Jackson*, 131 Ill. App. 3d at 139.

In *Jackson*, the appellate court found that the trial court applied the *Johnson* test and reached the proper conclusion. *Jackson*, 131 Ill. App. 3d at 140. The appellate court agreed with the trial court's conclusion that the doctor's testimony would have been "virtually nonprobative as an alibi." *Jackson*, 131 Ill. App. 3d at 140. Thus, the appellate court held "[t]he trial court determined the contention was spurious, a determination which was not manifestly erroneous and which we affirm." *Jackson*, 131 Ill. App. 3d at 140.

In *People v. Williams*, 224 Ill. App. 3d 517 (1992), the defendant asserted on appeal that he was denied effective assistance of counsel. Specifically, the defendant claimed that "the trial court failed to exam-

ine the readily apparent ineffective assistance when defense counsel, at the post-trial hearing, revealed that he had additional witnesses who were not called at trial." *Williams*, 224 Ill. App. 3d at 523. In support of his argument, the defendant in *Williams*, like the defendant in the case at bar, argued that the trial court erred when it failed to conduct an examination of the trial counsel's performance *sua sponte*, as defendant claims is required under *Krankel*. *Williams*, 224 Ill. App. 3d at 523. The defendant in *Williams* relies on *People v. Jackson* to support his contention that the trial court should have applied the *Johnson* test in an effort to determine whether independent counsel should have been appointed. *Williams*, 224 Ill. App. 3d at 523.

The appellate court in *Williams* held that the case must be remanded for a hearing on the defendant's possible ineffective assistance of counsel claim. The court based its decision on the fact that at the posttrial motion the defendant's attorney revealed that critical alibi witnesses were not called at trial. The defendant's attorney stated that the witnesses had been unavailable; however, the record is silent as to what efforts, if any, he made to present them. *Williams*, 224 Ill. App. 3d at 524. Additionally, the appellate court noted that the defendant did not file a *pro se* petition or write the judge a letter alleging ineffective assistance of counsel. *Williams*, 224 Ill. App. 3d at 524. However, the appellate court found that "the trial judge's strong comments to counsel at the hearing indicate that he was made aware of counsel's possible neglect." *Williams*, 224 Ill. App. 3d at 524. The *Williams* court held that "[w]here there is a clear basis for an allegation of ineffectiveness of counsel, a defendant's failure in explicitly making such an allegation does not result in a waiver of a *Krankel* problem." *Williams*, 224 Ill. App. 3d at 524, citing *People v. Jameson*, 155 Ill. App. 3d 650, 662-663 (1987) (where prior to trial the defendant requested new counsel, defense counsel filed a motion to withdraw which was denied, and defense counsel failed to make any effort to contact a possible key witness, the appellate court held that it was error to allow defendant's trial counsel to argue a motion based on allegations of her own incompetence). After determining that the defendant did not waive the issue, the appellate court held that the defendant's best possible defense consisted of alibi testimony given by witnesses who were not called to testify. *Williams*, 224 Ill. App. 3d at 524. Therefore, the *Williams* court held that, out of "fundamental fairness," a further investigation of counsel's performance was needed and remanded the matter to the trial court for a determination of whether the defendant's allegations of ineffectiveness either lacked substance or merely pertained to trial tactics. *Williams*, 224 Ill. App. 3d at 524. The appellate court clearly stated that if the trial court

found that trial counsel must have neglected the defendant's case, then independent counsel must be appointed to argue defendant's claim of ineffective assistance of counsel. *Williams*, 224 Ill. App. 3d at 524.

•11 In the case at bar, defendant did not file a *pro se* petition alleging ineffective assistance of counsel, nor did defendant write a letter to the trial judge making such a claim. However, in *Williams*, defendant's inaction does not result in waiver of this issue. In reviewing the facts at bar, we find the State's argument most persuasive. The State rightfully argues that the trial court did not err in not *sua sponte* conducting a hearing regarding the alleged ineffectiveness of defendant's trial counsel. Unlike *Williams*, in the case at bar, there is no clear basis for an allegation of ineffectiveness.

Defendant's defense depended on critical alibi testimony, and, therefore, defendant's mother testified as to her son's whereabouts at the time of the offense. According to her testimony, Patricia Hodges picked defendant up at school and brought him to the dollar store where he worked from 3 p.m. until 7 p.m. on the day of the shooting. Perhaps defendant's attorney, as a matter of trial strategy, believed one alibi witness would be sufficient to assure the jury that defendant was not guilty. Had no one been called to testify regarding defendant's whereabouts, we would be more inclined to find that defendant's case had been neglected by his attorney. Additionally, at the sentencing hearing, Patricia Hodges testified that she remembers having been subpoenaed to testify at defendant's trial but that she could not remember why she failed to appear in court. Thus, unlike the defense attorneys in *Williams* and *Jameson*, defendant's attorney did take affirmative action to compel Patricia Hodges' testimony. The fact that defendant's mother testified as an alibi witness and the fact that Patricia Hodges was subpoenaed to appear in court suggest that defendant's attorney was diligent in his efforts to prepare defendant's case. Since a clear basis for an allegation of ineffectiveness of counsel does not exist, we cannot find that the trial court erred in failing to *sua sponte* examine whether defendant was provided with effective assistance of counsel.

•12 Defendant argues that pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), his consecutive sentences are unconstitutional. Further, defendant contends that the trial judge made no specific findings concerning (1) the basis for ordering that his two 20-year sentences on counts I and II are to run consecutively or (2) the basis for ordering that his two 20-year sentences in the case at bar are to run consecutively with the sentence he received in an earlier case. Defendant assumes that his consecutive

sentences were ordered based on either section 5—8—4(a) or section 5—8—4(h) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a), (h) (West 1998)). Defendant argues that, under these provisions, questions of whether the events occurred in a single course of conduct or whether defendant was on bond at the time of the offense were not alleged in the indictment or submitted to the jury for determination and, therefore, were not proven beyond a reasonable doubt.

Issues involving substantial rights may be considered by a reviewing court even if not properly preserved in the trial court. 134 Ill. 2d R. 615(a); *People v. Brandon*, 162 Ill. 2d 450, 457-58 (1994). As the imposition of an unauthorized sentence affects substantial rights, we will address the merits of defendant's claim. *People v. Hicks*, 181 Ill. 2d 541, 545 (1998).

In the case at bar, at defendant's sentencing hearing, the State told the trial judge that one factor to be considered in determining defendant's sentence is that defendant shot the two children in the case at bar while he was out on bond for a Class X offense of possession of a controlled substance with intent to sell. On June 3, 1998, defendant was convicted of this drug crime and sentenced to eight years in the Illinois Department of Corrections.

On February 9, 1999, defendant was sentenced to two consecutive 20-year sentences on the two counts of attempted murder in the instant matter. Prior to the trial judge announcing defendant's sentence, the State argued that pursuant to "730 5/5—8—4," defendant should receive consecutive sentences. The State failed to articulate which paragraph of section 5—8—4 of the Unified Code of Corrections it was asking the trial judge to follow. The trial judge then ordered consecutive sentences and stated that his reasoning for doing so was that he was obligated to so hold pursuant to statute. However, the trial judge never identified the particular statute under which defendant's consecutive sentences were ordered. Rather, he simply stated that since defendant was found guilty of two separate counts of attempted first degree murder with regard to two separate individuals, the court was obligated to order consecutive sentences. Lastly, the trial judge clearly stated that defendant's sentence in the case at bar, 96 CR 15350, is to run consecutively with his sentence in the drug case, 96 CR 12455.

A review of the order of sentence and commitment to Illinois Department of Corrections (sentencing instrument) shows that defendant was sentenced to two consecutive 20-year terms on counts I and II. The sentencing instrument also states that defendant's sentence is to run consecutively with his sentence in 96 CR 12455. It is clear that the two consecutive 20-year terms in case 96 CR 15350 were imposed

pursuant to section 5—8—4(a) of the Unified Code of Corrections and those terms were to run consecutively to his eight-year sentence in case 96 CR 12455 pursuant to section 5—8—4(h) of the Unified Code of Corrections. In pertinent part, section 5—8—4(a) of the Unified Code of Corrections provides:

"(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless:

(i) one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury[.]" 730 ILCS 5/5—8—4(a) (West 2000).

Section 5—8—4(h) provides the following:

"If a person charged with a felony commits a separate felony while on pre-trial release or on pre-trial detention in a county jail facility or county detention facility, the sentences imposed upon conviction of these felonies shall be served consecutively regardless of the order in which the judgments of conviction are entered." 730 ILCS 5/5—8—4(h) (West 1998).

In *Apprendi*, the United States Supreme Court held that " 'under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' " *Apprendi*, 530 U.S. at 476, 147 L. Ed. 2d at 446, 120 S. Ct. at 2355, quoting *Jones v. United States*, 526 U.S. 227, 243 n.6, 143 L. Ed. 2d 311, 326 n.6, 119 S. Ct. 1215, 1224 n.6 (1999). The Court reasoned that " 'it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.' [Citations.]" *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363.

The State agrees with defendant's interpretation of *Apprendi*; the United States Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. However, the State contends that defendant's consecutive sentences need not be analyzed under *Apprendi* because defendant was not sentenced beyond the prescribed statutory maximum.

The Illinois Supreme Court recently addressed the constitutional-

ity of consecutive sentences under *Apprendi*. *People v. Wagener*, 196 Ill. 2d 269 (2001). The court held that because consecutive sentences remain discrete sentences, "a determination that sentences are to be served consecutively cannot run afoul of *Apprendi*, which only addresses sentences for individual crimes." *Wagener*, 196 Ill. 2d at 286. "*Apprendi* concerns are not implicated by consecutive sentencing," and, thus, we must reject defendant's argument. *Wagener*, 196 Ill. 2d at 286. Each of defendant's individual sentences was within the statutory range established by the legislature and are therefore proper under *Apprendi*.

For the foregoing reason, we affirm defendant's convictions for attempted first degree murder and the order providing that these sentences shall run consecutively. Finally, we affirm the trial court's decision to order that defendant's two 20 year sentences in the case at bar run consecutively with his sentence on the drug case, 96 CR 12455.

Affirmed.

QUINN, P.J., and THEIS, J., concur.