2020 IL App (1st) 182163-U

No. 1-18-2163

Order filed December 23, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19692 |
| | ) | |
| JORDAN BAILEY, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for attempt first degree murder is affirmed over his challenge to the sufficiency of the evidence of his intent to kill. Defendant's sentence is affirmed over his challenge to the trial court's imposition of a 20-year enhancement for personally discharging a firearm.

¶ 2    Following a bench trial, defendant Jordan Bailey was found guilty of two counts of attempt first degree murder, two counts of attempt armed robbery, and one count each of aggravated battery and aggravated discharge of a firearm. He was sentenced to 6 years' imprisonment for one count

of attempt murder, plus a 20-year enhancement for personally discharging a firearm, for a total sentence of 26 years. On appeal, defendant contends the State failed to prove him guilty of attempt murder where the evidence did not establish he intended to kill the victim. He also argues the trial court improperly applied a 20-year enhancement to his sentence where the evidence did not establish he personally discharged a firearm. We affirm.

¶ 3      Defendant was charged with four counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014)), which alleged he, without lawful justification and with intent to kill, shot Jerome Starks while armed with and by personally discharging a firearm, which constituted a substantial step toward the commission of first degree murder, and that proximately caused great bodily harm or permanent disfigurement to Starks.[1] Two counts of attempt armed robbery (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/18-2(a)(2) (West 2014)) alleged defendant, with the intent to commit armed robbery, approached a motor vehicle occupied by Starks and Deshun Mitchell and knocked on the window with a firearm, which constituted a substantial step toward the commission of armed robbery. One count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2014)) alleged defendant, in committing a battery, knowingly discharged a firearm and caused injury to Starks by shooting him about the body. One count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)) alleged defendant knowingly discharged a firearm in the direction of a vehicle he knew to be occupied by Mitchell.

¶ 4      Jerome Starks testified he was employed as a Chicago police officer in October 2014. In the early morning hours of October 24, 2014, he drove his BMW to a lounge located on the 600

_____

[1] The State *nol-prossed* two additional counts of attempt first degree murder that alleged defendant shot at Deshun Mitchell, a passenger in Starks's vehicle. After the court's guilty finding, but before sentencing, the State also *nol-prossed* the count of attempt first degree murder that alleged defendant caused great bodily harm to Starks.

block of East 75th Street. He spent 20 to 30 minutes inside the lounge, then returned to his BMW, which was parked on the 7500 block of South Langley Avenue, with his friend, Deshun Mitchell. Starks sat in the driver's seat and Mitchell sat in the front passenger seat. Starks noticed two men walking toward the BMW, and, in the side mirror, he saw one of the men walk behind the vehicle and toward the passenger side.

¶ 5    The other man approached the driver side of the BMW and pulled on the door handle. Starks did not "know if [this man] tapped on the window or something," but knew he had a gun "at some point." The man at the driver side door "tried to break the glass" and Starks "tried to pull away," "shielded [him]self," and "tried to drive away." He then realized he had been shot in the back.

¶ 6    Starks drove to 74th Street, where he encountered Chicago police officers and told them what happened. The police transported Starks to the hospital. He suffered a bullet wound on his "left side," "between [his] back and [his] shoulder blade." The bullet exited his body "just to the left of the center of the chest."

¶ 7    Starks identified photographs of his BMW as it appeared after this incident, which were entered into evidence. These photographs depict a white BMW sedan with a broken driver side door window, and blood on the driver's seat, floor below it, and driver side door frame.

¶ 8    On cross-examination, Starks testified he did not see the face of the man who approached the driver side of the BMW, and did not look at the driver side window when it broke.

¶ 9    Chicago police detective Brian McKendry testified he was assigned to investigate a crime scene on the 7400 block of South Langley in the early morning hours of October 24, 2014. He learned the victim had been shot, and that a witness saw two individuals run through a vacant lot

and down an alley. McKendry saw a black handgun with an extended magazine in a garage in the alley. He identified the gun as it appeared when he recovered it in photographs, which were entered into evidence. These photographs depict a black handgun with a magazine protruding from the bottom of the handle. McKendry also identified the gun and the extended magazine in court; they were entered into evidence as well.

¶ 10     Chicago police forensic investigator David Ryan testified he responded to the scene of the shooting of an off-duty police officer at approximately 1:15 a.m. on October 24, 2014. Ryan recovered the gun, which he described as a 9-millimeter handgun with an extended magazine. He observed one live cartridge in the chamber and four live cartridges in the magazine. He inventoried the gun, the magazine, and the cartridges, all of which he identified in court, and which were entered into evidence. He also recovered and inventoried a fired bullet from the front passenger side floor of the BMW, which he identified in court, and which was admitted into evidence. Ryan took DNA swabs from the undersides of the driver side and passenger side door handles, which he inventoried and identified in court, and which were entered into evidence.

¶ 11     Ryan identified a series of photographs he took, which he confirmed accurately depicted the scene as it appeared on the night of the shooting. These photographs depict, in relevant part, the gun inside the garage and a bullet on the floor of the BMW, next to the front passenger side door.

¶ 12     The parties stipulated Chicago police officer James Davoren arrested defendant on October 25, 2014.

¶ 13     Chicago police sergeant Thomas Carr testified he was on duty as a detective and was assigned to interview defendant, whom he identified in court, on October 25, 2014. Carr read

defendant his *Miranda* rights; defendant indicated he understood them and agreed to speak with Carr.

¶ 14    Defendant "became visibly distraught, upset, and crying," and said, "I shot him. I'm sorry. I shot the officer. I f****d up." Defendant stated he was with "Gucci," and that they planned to rob someone near the lounge because defendant was out of work and needed money. Defendant stated he was armed at the time of this incident. He and "Gucci" saw a white BMW; defendant approached the driver side and "Gucci" approached the passenger side. Defendant struck a window with the gun, "and the victim attempted to drive away and the gun went off." Defendant stated the gun went off after the BMW began driving away. Defendant also told Carr he ran from the scene and stored the gun in a garage.

¶ 15    On cross-examination, Carr testified defendant did not state he wanted to kill the driver of the BMW. Carr did not ask defendant if he pulled the trigger, and defendant had no explanation for why the gun discharged.

¶ 16    Illinois State Police forensic scientist Marc Pomerance was qualified as an expert in the field of firearms and tool mark identification. He received a fired 9-millimeter bullet inventoried by Chicago police in connection with this case. Pomerance "noticed that it was a fired bullet, it had damage to the nose of the bullet that had embedded in it some white powder, which [he] recognized to be potentially powdered glass." He also received a fired 9-millimeter cartridge case, a 9-millimeter semiautomatic pistol, a magazine, one unfired 9-millimeter bullet from the chamber of the gun, and four unfired 9-millimeter bullets from the magazine. After test firing the gun, Pomerance concluded the fired bullet and cartridge case had been fired from the gun he received.

¶ 17    Pomerance testified the gun had three safeties. The active safety could be manually controlled to prevent the gun from firing; Pomerance tested this safety and found it was working. The magazine safety blocked the firing mechanism if the magazine was not inserted properly; Pomerance tested this safety and found it to be operational as well. He could not test the drop safety because the gun could not be safely dropped in the laboratory. Pomerance opined the gun had no mechanical malfunctions and "can only be fired when the trigger is pulled." Pomerance also measured the "trigger pull" of the gun to be "between six and a half and seven pounds of pressure needed for the firearm to discharge." The gun did not "accidentally go off at any point" when Pomerance tested it.

¶ 18    On cross-examination, Pomerance testified a gun can be "dangerous when you knock it around" because "[t]here is a potential for the gun to discharge, depending on the type of gun it is." The drop safety was "designed for [when the gun is] dropped and it hits – whatever it lands on that the gun will not go off." This could include when the gun is "knocked against something when you're holding it." Pomerance testified there were two drop safeties in the gun, and he did not test either of them.

¶ 19    The parties stipulated Cook County State's Attorney's Office investigator Molly Mills obtained a buccal swab from defendant on March 5, 2015, and inventoried it.

¶ 20    Illinois State Police forensic scientist Brian Schoon was qualified as an expert in the field of forensic DNA analysis. He testified he received swabs taken from a gun and the driver and passenger side doors of a vehicle for DNA analysis. He also received a DNA sample from defendant in the form of a buccal swab. A major DNA profile on the gun matched defendant. Defendant also matched the DNA profile from the driver side door of the vehicle. The DNA sample

from the passenger side door was not suitable for comparison. Schoon identified the DNA samples he analyzed, which were admitted into evidence.

¶ 21    Defendant moved for a directed finding, arguing the State had not established his intent to kill, or that he personally discharged a firearm. His motion was denied.

¶ 22    Defendant testified that, in the late hours of October 23, 2014, he was at his friend Terry's house with Terry and another friend named "Gucci" Soumare.[2] Soumare suggested they rob someone because he needed money, as did defendant, because he was expecting a child. Defendant did not want to rob anyone, but Soumare said defendant would "basically just hold the gun for the most part and [Soumare] will do all the talking and make sure that we get it." Soumare got Terry's gun from "somewhere" in the next room, handed it to defendant, and told him to carry it. Defendant did not want to carry the gun, but he agreed to because Soumare was not wearing a belt in which he could hold it.

¶ 23    Defendant and Soumare went to a porch near 74th and Langley and looked for someone to rob. Defendant noticed two people getting into a white BMW parked less than a block away. The BMW moved to park in front of a vacant lot, and Soumare suggested that he and defendant rob the people in the BMW. Defendant carried the gun "on [his] waist," but he did not know whether it was loaded, and did not check to see whether it was loaded.

¶ 24    Defendant approached the driver side of the BMW, and Soumare approached the passenger side. Defendant pulled on the driver's door handle and tapped on the window twice with the gun. The driver was facing the passenger; defendant did not see the driver's face, and the driver did not

---

[2] Defendant testified "Gucci's" last name is Soumare. The indictment, in which Soumare was named as a codefendant, indicates Soumare is his first name. We will simply refer to him as Soumare.

look at defendant. When defendant tapped on the window with the gun, "the glass broke and then [defendant's] ear was ringing *** and then the car kind of sped off all at the same time kind of real fast." Defendant did not know the driver of the BMW had been shot. Defendant ran from the scene, put the gun in a garage, and and went home.

¶ 25    Defendant denied he and Soumare intended to shoot the person they robbed, and denied he intended to shoot and kill the driver of the BMW. He also denied he had his finger on the trigger before the gun discharged.

¶ 26    On cross-examination, defendant testified Soumare told him to "point the gun and [Soumare] would do all the talking." Defendant approached the driver side of the BMW "to point the gun at the people." When he pulled the gun out, his hand was on the handle, which is "right by the trigger." He grabbed the door handle, tapped the gun on the window two or three times, and the gun discharged. Defendant "heard the shot and [saw] the glass break." He did not know whether the window broke because of him tapping on the window or because the gun discharged.

¶ 27    After defendant fled the scene, he met Soumare at his house, and Soumare asked him why he shot the gun. Defendant responded, "I don't know why but I didn't shoot the gun. I didn't pull the trigger." Several hours later, defendant learned he had shot a police officer. He did not contact anybody about the shooting, even though he did not mean to shoot the officer and knew the shooting was an accident. Defendant acknowledged he "apologized for shooting the officer" to Carr. He did not recall telling Carr the gun discharged after the BMW began driving away.

¶ 28    On redirect examination, defendant testified he did not check whether the gun was loaded because he "didn't plan on shooting." He denied he cocked the gun.

¶ 29 In closing, the State argued the gun "discharged directly into the back of the victim in this case because that's where the gun was pointed and when you point a gun at someone's back and pull the trigger, that proves intent to kill." Defendant argued there was no evidence he was "upset" Starks drove away, he had no motive to kill because he did not know Starks, and Starks never identified defendant.

¶ 30 The court found defendant guilty on all counts except for one count of attempt murder premised on permanent disfigurement of Starks. In announcing its ruling, the court concluded that, based on the physical evidence, "the window shattered, the car was driving away and the gun was pointed as [Starks] drove away." The court explained "the intent to kill derives *** from the positioning of where that bullet entered Mr. Starks' body and that the vehicle was pulling off at the time that shot was fired." The court also rejected as not credible "that [defendant] was unaware whether that weapon was loaded or not."

¶ 31 Defendant filed a motion for a new trial, which argued the State did not prove he had the specific intent to kill Starks or that he personally discharged a firearm. In responding to the motion, the State *nol-prossed* the attempt first degree murder charge premised on great bodily harm. The court denied the motion as to the other counts.

¶ 32 The court merged all counts into one count of attempt first degree murder by personally discharging a firearm and sentenced defendant to 26 years' imprisonment on that count. The court imposed the minimum sentence of 6 years for attempt first degree murder, plus the 20-year enhancement for personally discharging a firearm.

¶ 33 Defendant did not file a motion to reconsider sentence.

¶ 34    On appeal, defendant first challenges his conviction for attempt murder. Specifically, defendant contends his conviction should be reversed where the evidence was insufficient to establish his intent to kill Starks.

¶ 35    In a challenge to the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. *People v. Pizarro*, 2020 IL App (1st) 170651, ¶ 29. We do not retry a defendant or substitute our judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2008). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011). We will only reverse a conviction if the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 36    Defendant was charged with attempt first degree murder for, with intent to kill, shooting Starks, which constituted a substantial step toward the commission of first degree murder, and personally discharging a firearm. 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014). To sustain this charge, the State had to prove beyond a reasonable doubt "(1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) defendant possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 12; 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014).

¶ 37    Because attempt murder is a specific intent offense, the State had to prove defendant had the specific intent to kill. *Viramontes*, 2017 IL App (1st) 142085, ¶ 12. "Intent is a state of mind which can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred." *People v. Brown*, 2015 IL App (1st) 131873, ¶ 14. There is a presumption of intent to kill where one voluntarily and willfully commits an act that has a natural tendency to destroy another's life. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. An intent to kill may be proven where the surrounding circumstances show that the defendant "fir[ed] *** a gun at or towards another person with either malice or a total disregard for human life." (Internal quotations omitted.) *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). "It falls to the trier of fact to determine if the requisite intent to kill existed, and that determination will not be disturbed on appeal unless there is a reasonable doubt as to defendant's guilt." *Petermon*, 2014 IL App (1st) 113536, ¶ 39.

¶ 38    We find a rational trier of fact could conclude the State proved defendant's intent to kill beyond a reasonable doubt. Defendant admitted he agreed to "point the gun" at the victim of his and Soumare's robbery attempt. To do so, he approached a vehicle he knew to be occupied while armed with a loaded gun. Defendant brandished the gun while in close proximity to Starks. He was close enough to touch the driver side door handle of the BMW, as the DNA evidence confirmed, and close enough to touch the driver side window with the gun itself. Thus, defendant put himself in a position to shoot Starks at close range.

¶ 39    There is no dispute Starks was shot in the left upper back. Given the relative positions of defendant and Starks, it is reasonable to infer defendant pointed the gun at Starks's back and fired it. This may have occurred when defendant shot into the BMW just as Starks began to drive away,

as defendant's statement to Carr suggests, and as the trial court found. A reasonable factfinder could have also concluded defendant fired the gun when Starks was still facing toward Mitchell with his back toward defendant, as the bullet traveled back-to-front through Starks's body and landed on the passenger side of the BMW. Either scenario supports an inference defendant shot Starks intentionally.

¶ 40    Further, the evidence did not support an inference the gun discharged accidentally, as defendant suggested at trial and suggests on appeal. The first thing defendant said to Carr was "I shot him. I'm sorry. I shot the officer," phrasing that suggests defendant fired intentionally, not that the gun discharged by accident. Moreover, Pomerance's testimony established that six and a half to seven pounds of pressure were necessary for the gun to fire, which suggests defendant pulled the trigger intentionally. This conclusion is also supported by Pomererance's expert opinion that the gun could only fire if the trigger was pulled. Altogether, the evidence supported a reasonable conclusion defendant intentionally pointed the gun at Stark's back and pulled the trigger.

¶ 41    " '[T]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *Petermon*, 2014 IL App (1st) 113536, ¶ 39 (quoting *Ephraim*, 323 Ill. App. 3d at 1110). That is the case here, where the evidence supported a reasonable conclusion defendant shot Starks in the back. Defendant acted with " 'a total disregard for human life' " sufficient to support a finding of intent to kill when he easily could have killed Starks, given that the bullet struck him in the left upper torso and passed through his body. See *Id.* Thus, the evidence was sufficient to support defendant's conviction for attempt first degree murder.

¶ 42 We find defendant's arguments to the contrary unpersuasive. For example, defendant claims "he did not know if the gun his friend gave him was loaded or ready to fire." However, the trial court specifically found this claim not credible, and we defer to its credibility findings. See *People v. Sutherland*, 223 Ill.2d 187, 242 (2006). Defendant also argues that, because he shot Starks non-fatally, one can only conclude he did not intend to kill Starks. We have rejected this exact argument: "Poor marksmanship is not a defense to attempt murder, and it is a question of fact for the [factfinder] to determine whether defendant lacked the intent to kill or whether defendant was simply unskilled with his weapon and missed his target." (Internal citations omitted.) *People v. Teague*, 2013 IL App (1st) 110349, ¶ 27.

¶ 43 In addition, defendant claims he "could have reflexively and unintentionally clenched his fist and pulled the trigger." Accepting this explanation would require us to search out every possibility consistent with innocence and elevate it to the level of reasonable doubt, which the law prohibits. See *People v. Hall*, 194 Ill. 2d 305, 332 (2000). None of defendant's arguments warrant a finding that the State failed to establish his specific intent to kill. Accordingly, we affirm defendant's conviction for attempt first degree murder.

¶ 44 Defendant next challenges his sentence. Specifically, he argues the trial court improperly applied a 20-year enhancement to his sentence because the evidence did not establish he personally discharged a firearm.

¶ 45 We note defendant did not file a motion to reconsider sentence and, therefore, his sentencing challenge is arguably forfeited. See *People v. McGath*, 2017 IL App (4th) 150608, ¶ 66. But even if we ignore the forfeiture because the State did not raise it (see *People v. Bridgeforth*,

2017 IL App (1st) 143637, ¶ 46), we find the trial court did not err in imposing the 20-year sentencing enhancement.

¶ 46     Although a trial court generally has discretion at sentencing, a sentencing enhancement for personal discharge of a firearm is mandatory. "[A]n attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/8-4(c)(1)(C) (West 2018). The Criminal Code's general definitions article defines "personally discharged a firearm" as "knowingly and intentionally fir[ing] a firearm causing the ammunition projectile to be forcefully expelled from the firearm." 720 ILCS 5/2-15.5 (West 2018).

¶ 47     The trial court correctly concluded defendant personally discharged a firearm. There is no dispute that the gun discharged, and defendant admitted he was holding the gun when it discharged. There is also no dispute a bullet was expelled from the gun and struck Starks in the back. As explained above, we agree with the trial court's conclusion that defendant fired the gun intentionally. Thus, we can only conclude defendant "personally discharged a firearm" for the purposes of section 5/8-4(c)(1)(C), and the trial court properly applied the mandatory 20-year enachment to his sentence. Accordingly, we affirm defendant's sentence of 26 years.

¶ 48     For the foregoing reasons, we affirm defendant's conviction.

¶ 49     Affirmed.