THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GERALD WILLIAMS, Defendant-Appellant.

First District (6th Division)    No. 1—89—3134

Opinion filed January 17, 1992.

Michael J. Pelletier and Manuel S. Serritos, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Brian Clauss, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Gerald Williams, age 19, was found guilty of the murder of Ronnell Robinson, age 17. Defendant was sentenced to a term of 30 years. On appeal, defendant contends that the trial court erred in failing to examine defense counsel's performance at trial upon learning at the post-trial motion that defense counsel had certain alibi witnesses whom he failed to call at trial. Defendant also contends that the sentence was excessive.

The pertinent facts are as follows. James Moore, age 17, testified for the State that the deceased was his cousin. On the evening of November 21, 1987, Moore was driving his uncle's 1979 black Pontiac Grand Prix. At approximately 11:30 p.m., he picked up the deceased, George Jones, and Andre Spencer. The group drove to the Factory, a teen-age dance hall in Chicago.

Moore further testified that his group became involved in an argument when the deceased accused another youth, later identified as Travis Johnson, age 12, of taking his jacket. A heated argument ensued, but no blows were exchanged. Afterward, Moore saw Johnson approach several youths in the dance hall. Moore advised the deceased that they should leave, and began walking toward the door. En route to the exit, Moore and the deceased were approached by defendant and Johnson. Johnson indicated that he wanted to fight the deceased.

After Johnson's threats, the deceased and Moore resumed walking to the exit when they were again approached by defendant and Johnson. After Moore used expletives, defendant struck Moore in the face. The deceased struck defendant, and Moore joined in the melee. Security guards broke up the fight and ordered the parties to leave the hall.

Afterward, Moore met with Jones and Spencer in his car, and drove around the block a few times. The deceased entered Moore's car. Moore was in the driver's seat, the deceased sat in the middle, and Jones was in the seat next to the window. Spencer and two other youths were in the back seat.

Moore drove west on Madison Street and turned on Cicero Avenue, proceeding southbound. While stopped at a traffic light, Moore noticed an automobile he had seen near the Factory, a brown Chevrolet Citation, touching the back tires of his car. After the light turned green, Moore turned left on Lexington Avenue and travelled eastward. Moore was advised by his passengers that the Chevrolet was still behind him.

As Moore drove under a viaduct and placed the gas pedal to the floor, he heard a gunshot and the sound of breaking glass. The back

of his head was showered with glass, and the deceased slumped on top of him. Moore observed that the deceased had been shot in the back of the head, and he immediately proceeded to the hospital.

George Jones testified for the State that he had known the deceased for approximately three years. Jones essentially corroborated Moore's version of the group's arrival at the Factory, and the subsequent argument between defendant, Moore, the deceased and Johnson. Jones also stated that during the time Moore was circling the block, Jones noticed the Chevrolet behind their car and that it continued to follow them to the corner of Lexington and Cicero. Defendant was the only person Jones could clearly see inside the car. Once Moore drove under the viaduct, Jones heard one gunshot which fatally wounded the deceased. Jones spoke with the police once they arrived at the hospital. On December 6, 1987, Jones identified defendant from a photo array, and later in a lineup.

On cross-examination, Jones testified that he had never seen defendant prior to the night of the altercation. Somewhere near Cicero and Adams, Jones looked at the Chevrolet for a second time and saw defendant still in the front passenger seat. Jones never saw defendant in the back seat of the Chevrolet.

Derrick Baugh testified for the State that he was presently incarcerated because he had also been charged with the deceased's murder. Baugh had known defendant for about four years. On the evening in question, Baugh borrowed a brown Chevrolet Citation from a friend. Earlier that evening, Baugh had dropped his cousin off at the Factory, and returned to pick her up at 2 a.m. After he was unable to locate his cousin, Baugh picked up defendant, Johnson, Allen Williams, Donald Tankston, and Thaddeus Scott at the Factory. According to Baugh, he drove, defendant sat next to the window, and Scott was seated between them in the front seat. Allen Williams, Tankston and Johnson shared the back seat. Defendant asked Baugh to take him home.

After leaving the Factory, Baugh saw a black car. Defendant asked Baugh to follow that car because someone inside it had taken his jacket. Baugh was not aware that anyone in his car had a gun. Baugh began following the car south on Cicero and turned onto Lexington. As they approached the viaduct, he saw defendant fire a gunshot out the car window in the direction of the black car. After the shooting, Baugh dropped defendant and the others at a food stand.

Baugh testified he did not learn until later that someone in the black car had been shot. Baugh did not speak to the police about the

incident because he was scared. Baugh was arrested for his involvement in the murder several months later. Baugh indicated that the State's Attorney had not made any promises to him in exchange for his testimony.

Thaddeus Scott testified for the State that he is also currently incarcerated after being charged with the deceased's murder. In return for Scott's testimony, the State's Attorney recommended that he receive a lesser sentence.

On November 21, 1987, Scott went to the Factory alone. After he arrived, Scott met Allen Williams and Tankston. At approximately 1:30 a.m., defendant asked Scott to watch his back during a fight because he had angered some youths who had tried to take Johnson's jacket. Around 2 a.m., Scott, Allen Williams and Tankston left the Factory and began to walk home when they met with defendant and Johnson. A car pulled up and a group of people began chasing the men through the alley behind the Factory. Scott and his group saw Baugh drive by in a Chevrolet and entered his car. Scott sat between Baugh and defendant in the front seat; the others sat in the rear of the car.

Scott further testified that defendant pointed at a black car and stated that "they had his jacket." Defendant told Baugh to follow the car. Baugh did so, and defendant asked Scott to pass him the gun located under the seat. Scott stated that he handed defendant a 9-millimeter pistol. Defendant rolled down the window and fired several shots at the car as it approached the viaduct. After the shooting, Baugh dropped the group off at a food stand.

Scott first learned on the following day that someone had been killed. Scott did not report the incident to the police because he was scared. Approximately 60 days later, Scott was arrested for his role in the crime. Later that day, Scott confessed his involvement in the murder and identified defendant as the shooter.

Travis Johnson testified for the State that he was 12 years old at the time of the incident. On the evening in question, Johnson was at the Factory. At approximately 1 a.m., he had an argument with the deceased over a jacket. No blows were exchanged. Johnson informed defendant that he needed his support. Defendant approached the deceased, and asked him why he wanted to fight Johnson. At that point, a fist fight erupted between defendant, Scott, the deceased and Tankston. The fight was broken up by security. Johnson then left the Factory with defendant and proceeded home alone, while defendant walked north on Van Buren Street.

Johnson was then impeached with his grand jury testimony, wherein he testified that after he left the Factory both he and defendant rode in the car driven by Baugh, and that Scott, Allen Williams and Tankston were also in the car. Johnson stated that he fabricated the grand jury testimony from the story the police had told him during his interrogation. After spending the previous night in the police station, Johnson stated that he was scared and afraid that he was going to jail, and that the police had threatened him.

Assistant State's Attorney Frank Zelezinski testified for the State that in December 1987 he was assigned to felony review, and that he interviewed Johnson on December 9, 1987. Zelezinski related that Johnson appeared relaxed and made no complaints concerning his treatment by the police.

Chicago police officer Greg Bronsberg testified for defendant that he interviewed Jones, Spencer and Moore in the hospital emergency room shortly after the shooting, and that none of them recognized any of the individuals in the other car. Officer James Capesius testified for the defense concerning certain inconsistencies found within Scott's and Baugh's statements.

After the testimony of the two officers, the defense rested, and the jury found defendant guilty of murder.

Thereafter, defendant presented a motion for a new trial, at which time the following colloquy occurred:

"THE COURT: What have you to say on behalf of the motion?

DEFENSE COUNSEL: I have two witnesses reflected in the motion, Anthony Jones—

THE COURT: This is a witness?

DEFENSE COUNSEL: Yes, Judge. Judge, before you is Anthony Jones. He is an individual placed on the defense amended answer to discover[y] prior to trial as a witness for Gerald Williams in this regard.

Judge, on the date that the matter was set for trial, Mr. Jones was here on the first day. However, the State concluded their case in chief. *** On the day that the defense was to present their case, Mr. Jones was unavailable and we were unable to locate him. Subsequently[,] in our [zeal], his telephone was not operating at that time and we did not have contact with him.

THE COURT: State *** Counsel says he has a witness who wasn't available at the time of trial because he was sick or something.

PROSECUTOR: Okay. He has some newly discovered information.

THE COURT: So he wants to put him on. Let's put him on and see what he would say just for the sake of the record."

Anthony Jones testified that defendant was with him at the time the deceased was murdered. Jones testified that he left the Factory with Johnson at 1 a.m. and walked to his home. Approximately 10 minutes later, defendant appeared at his door. A few minutes after that, another friend, a youth known to Jones only as Rickey, came to the door. Defendant and Rickey stayed for about 45 minutes, at which time Jones went to bed.

During cross-examination, Jones testified that he did not see defendant while at the Factory. Jones did not mention that defendant was with him the morning he spoke with the investigating officers following the shooting because they failed to pose any questions regarding defendant.

Defense counsel also argued that the testimony of Allen Williams would have indicated that "he didn't know anything about anybody having been shot *** on that particular day." At that point, the following dialogue transpired:

"THE COURT: Anything else?

DEFENSE COUNSEL: Just those, your Honor.

THE COURT: What's that got to do with the motion, counsel?

\* \* \*

DEFENSE COUNSEL: It's other information or testimony that would have been brought out at trial.

THE COURT: What do you think, you try it once, you [lose] and you *** say wait a second, I *** got more evidence. I have never heard of anything more ridiculous in my life. That's not newly discovered evidence.

DEFENSE COUNSEL: Judge, the State indicated that they believed the evidence was hearsay. There was a mistaken belief I was under at the time of trial and I have since discovered it.

And it's newly discovered to me that the police officer had investigated this and had a conversation involving such matters which are hearsay and not admissible.

PROSECUTOR: Judge, counsel had the reports at trial. He knew of the testimony and he knew the people that spoke those words and that was not presented by him.

THE COURT: And it would be hearsay, everything testified to. He could have called the witness and didn't.

DEFENSE COUNSEL: Judge, the witnesses themselves, Allen Williams and Donald Tankston were [una]vailable to my knowledge, unable to be found at the address. I have been through the process of trying to seek out those individuals."

After further argument, the trial judge found that there was no showing that there was any newly discovered evidence and denied defendant's motion for a new trial. After hearing factors in aggravation, the court sentenced defendant to a 30-year prison term.

■ On appeal, defendant contends that he was denied effective assistance of counsel. Defendant asserts that the trial court failed to examine the readily apparent ineffective assistance when defense counsel, at the post-trial hearing, revealed that he had additional witnesses who were not called at trial. Defendant contends that the trial court erred by not conducting an examination of trial counsel's performance *sua sponte*, as required by *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045. In *Krankel*, defendant filed a *pro se* motion for a new trial which repeated the assertions of defense counsel's motion, but added the issue of ineffective assistance of counsel based on defense counsel's alleged refusal to set forth the defense of alibi and alleged failure to investigate defendant's whereabouts at the time of the offense. Our supreme court held that defendant should have had counsel, other than his originally appointed counsel, to represent him at the post-trial hearing in regard to his *pro se* motion for a new trial.

Defendant also relies upon *People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466, wherein defendant wrote the trial judge a letter before the post-trial hearing in which he complained of his private trial counsel's ineffectiveness. The *Jackson* court stated that the trial court should first examine the factual matters underlying defendant's claim. If the claim goes to matters of trial tactics or strategy, defendant's claim should be found spurious and his request for new counsel denied. However, if the factual matters show possible neglect of defendant's case, the court should appoint new counsel who can undertake an independent evaluation of defendant's claim and present the matter to the court from a detached, yet adversarial position. (*Jackson*, 131 Ill. App. 3d at 139, 474 N.E.2d at 474.) In *Jackson*, the court concluded that defendant's attorney, upon questioning by the court after trial, offered a valid explanation concerning his decision not to call defendant's doctor because he could not be used as an effective alibi witness.

■ We agree with defendant that in accordance with *Krankel* and *Jackson* and in view of what transpired at the post-trial motion here, this case must be remanded for a hearing on the possible ineffective

assistance of counsel. At the post-trial motion, counsel revealed that he had additional witnesses who were not called at trial and who would have provided critical support to defendant's alibi defense. Counsel stated that the witnesses had been unavailable, but the record is silent as to what efforts counsel had made to present them. Indeed, it appears that counsel made only a perfunctory effort to secure the testimony of Jones. He made only a vague comment that Jones' telephone was not working. Counsel was even less specific about his failure to locate Tankston and Allen Williams. At the post-trial motion, counsel offered Jones' testimony as newly discovered evidence, but the trial court correctly pointed out that the testimony was not and could not be considered newly discovered.

Defendant did not file a *pro se* petition or write to the judge claiming ineffective assistance of counsel. Nevertheless, the trial judge's strong comments to counsel at the hearing indicate that he was made aware of counsel's possible neglect. Where there is a clear basis for an allegation of ineffectiveness of counsel, a defendant's failure in explicitly making such an allegation does not result in a waiver of a *Krankel* problem. (*People v. Jameson* (1987), 155 Ill. App. 3d 650, 508 N.E.2d 267.) Defendant's best possible defense consisted of the alibi testimony of Jones, and possibly that of Tankston and Allen Williams. Fundamental fairness requires a further investigation of counsel's performance.

Accordingly, we remand the cause to the trial court with directions to conduct a preliminary investigation of the matter of defense counsel's performance. If the court determines that the charges lack substance or pertain only to trial tactics, no new counsel need be appointed to represent defendant. If, however, it is indicated that trial counsel may have neglected defendant's case, the court should appoint new counsel to argue defendant's claim of ineffective assistance of counsel. See *People v. Nitz* (1991), 143 Ill. 2d 82, 572 N.E.2d 895.

■ In view of our holding, we must comment on defendant's contention that the sentence of 30 years was excessive in light of his age, his insignificant criminal record and the circumstances surrounding the offense. Defendant was 19 years old and had only one previous misdemeanor conviction for which he received a six-month term of supervision.

A trial court is in a better position to determine the punishment to be imposed than is a court of review. (*People v. Jackson* (1986), 140 Ill. App. 3d 318, 488 N.E.2d 1056.) A trial court's sentence may not be altered on appeal absent an abuse of discretion. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

Despite defendant's youth and his minimal criminal record, we do not believe that the trial court abused its discretion in the imposition of sentence. Defendant was convicted of the senseless and brutal killing of a youth after a brief altercation in a dance hall. The trial judge characterized the crime as an execution. We will not disturb the sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is remanded for further proceedings consistent with the holdings of this opinion.

Remanded.

EGAN, P.J., and LaPORTA, J., concur.