THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANNIEL HENNEY, Defendant-Appellant.

First District (5th Division)   No. 1—00—0177

Opinion filed September 13, 2002.—Rehearing denied October 21, 2002.

Michael J. Pelletier and Jennifer Bonjean, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

In a 43-count indictment, defendant Danniel Henney and his codefendant Dino Dicorpo were charged with first degree murder, aggravated arson, burglary and residential burglary. Defendant's case was severed from that of his codefendant and separate trials were held.[1] Following a jury trial, defendant was convicted of six counts of first degree murder and one count each of burglary, arson and aggravated arson. On the murder convictions, defendant was sentenced to natural life in prison. He was also sentenced to a concurrent 7-year

---

[1] Codefendant Dicorpo was convicted of six counts of first degree murder, burglary, arson and aggravated arson. His convictions and sentence were affirmed on direct appeal. *People v. Dicorpo*, No. 1—00—0562 (2002) (unpublished order under Supreme Court Rule 23).

prison term on his burglary conviction and a consecutive 30-year term on his aggravated arson conviction. On appeal, defendant contends that the trial court erred: (1) in refusing to qualify a defense witness as an expert; (2) in allowing the State to present improper rebuttal testimony; (3) in failing to order *sua sponte* a hearing into defense counsel's effectiveness at trial; (4) in imposing a consecutive sentence on his aggravated arson conviction; and (5) in failing to order *sua sponte* a fitness hearing. Defendant does not challenge the sufficiency of the evidence in support of his convictions. For the reasons set forth below, we affirm the judgment of the trial court. Defendant's contention regarding a fitness hearing will be determined in an unpublished portion of this opinion.

## BACKGROUND

Defendant's convictions arose from a fire set in the early morning hours of September 15, 1997, on a back porch of the apartment building located at 2322 South 61st Avenue in Cicero. The fire resulted in the death of Anthony Poull (Anthony) and his five children. In a written statement defendant gave to an assistant State's Attorney on December 23, 1997, he explained that on the night of the fire, he had been with Dicorpo, Jason Laurie and Peter Fisher at Laurie's home located in Cicero. After the four "did some drinking" and smoked some "weed," they left Laurie's home and drove around the area looking for something to steal. Eventually, the four pulled into an alley behind some houses located on 61st Avenue. Defendant and Dicorpo then got out of the car, jumped a fence and unsuccessfully attempted to open the window of a garage in order to enter and steal things. Upon seeing the rear door of the apartment building open, the two passed through the door, which led to a back porch containing boxes of clothes and a clothesline with items hanging on it. When defendant and Dicorpo failed to find "anything good to steal," defendant dropped a cigarette he had been smoking near some boxes of clothes and Dicorpo, using a lighter, lit the items hanging on the clothesline on fire. The two then returned to the car and informed Laurie and Fisher that they had started a fire. The four drove around the block a few times until they saw the fire "get bigger and bigger." After returning to Laurie's home, defendant heard sirens and fell asleep. The next morning, defendant learned that five children died in the fire.

Prior to trial, defendant filed a motion to quash arrest and suppress statements. In the motion, defendant claimed that because of his illiteracy and lack of education, he did not understand his *Miranda* rights as they were explained to him, and therefore, his statements to police were not knowingly and willingly made.

At the hearing on the motion, the defense called Vivian Liese, who was an educational consultant and diagnostician. She stated that her background had been in learning disabilities and that she had worked with people having learning problems.

Liese stated that defendant would have difficulty reading anything beyond a third-grade level and opined that the readability of the *Miranda* warnings and his statement to investigators were at a mid-seventh-grade level. She also stated that even if *Miranda* warnings were read to defendant, he would have a difficult time understanding them. Liese stated further that given the readability of defendant's written statement, defendant would have difficulty understanding it, even if it were read to him.

The State rebutted Liese's testimony with that of Dr. Paul Fauteck, a senior staff psychologist with the department of forensic clinical services of the circuit court of Cook County. Following the hearing, defendant's motion to suppress was denied and his statement was admitted as substantive evidence at trial. The denial of the motion to suppress has not been raised as an issue on appeal.

At trial, Gary Gonzalez, a firefighter with the Cicero fire department, testified that upon arriving at the scene, he was informed that five children were trapped on the second floor of the two-flat apartment building. At the time, Gonzalez saw a "huge amount of fire," which was predominately in the rear of the building. Gonzalez testified that he entered the burning building through a second-story window, where he found all five of the deceased Poull children. Without objection, Gonzalez testified through the use of photographs as to the identify of the five children and their locations within the apartment at the time of their deaths.

Peter Fisher testified that he had known defendant for about five years and had met him through Jason Laurie. On the night of September 14, 1997, Fisher was at Laurie's home, where he saw defendant, Dicorpo and Laurie ingest cocaine and smoke marijuana. After drinking some beer, Fisher, defendant, Dicorpo and Laurie decided to drive around Cicero. The four went "driving around" for about a half hour before turning into an alley. Dicorpo then stated, "Stop the car." Dicorpo and defendant, who had been riding in the backseat, then got out of the car and walked down a gangway before Fisher lost sight of them. About 15 minutes later, Fisher saw a garage door open, and defendant and Dicorpo emerged from the garage in a black Nissan. Dicorpo, who was driving, instructed Fisher and Laurie to follow him and defendant. After arriving back at Laurie's house, defendant and Dicorpo removed the radio from the Nissan and the two took it to a side street in Oak Park and "dumped" it there.

After abandoning the car, Dicorpo and defendant got into the backseat of the car Laurie was driving and the four continued to ride around Cicero. At one point, Laurie turned down an alley on the 2300 block of South 61st Avenue and Dicorpo instructed him to stop the vehicle. Dicorpo and defendant then exited the car and walked into a gangway. Fisher believed that the two would attempt to steal things from the garage, as they had previously done.

About 15 minutes later, Fisher saw defendant and Dicorpo running toward the car. The two "jumped" in while both yelled, "Go, go, go, go." When asked by Laurie what was wrong, defendant and Dicorpo, at the same time, stated they had lit a "cover" on fire. The four then drove around the block three times until they saw flames coming out of a window. After returning to Laurie's house, the four got out of the car and saw fire trucks coming down the block. Upon seeing this, defendant stated, "Nobody better not say nothing." Fisher stated that he did not tell anyone about what had occurred until he was interviewed by detectives in December of 1997.

On cross-examination, Fisher denied taking any cocaine and smoking any marijuana on the night in question, but admitted to being "pretty intoxicated" from drinking. Fisher also testified that he had not been charged in connection with the fire that claimed the lives of the six members of the Poull family.

Jason Laurie testified to many of the same facts as Fisher regarding the events prior to defendant and Dicorpo exiting the car in the alley behind the 2300 block of 61st Avenue. Laurie also testified that about 15 minutes after defendant and Dicorpo got out of the car and went through the gangway, they emerged running from the gangway, "jumped" into the car and stated, "Go, go, go." After pulling away from the scene, Laurie asked what had occurred, and they responded that they had started a fire. Not believing them, Laurie drove around the block three times. On the first trip around the block, Laurie did not see anything happening to the building; on the second, he saw a glow in the back window; and on his final trip, he saw flames coming out of the window on the back porch of the house. Upon arriving back at his house, Fisher saw fire trucks and was instructed by defendant not to say anything regarding the events that had occurred that evening. Around 11:30 a.m. on December 22, 1997, police arrived at Laurie's home, which he shared with Dicorpo, and asked to talk to them.

On cross-examination, Laurie admitted to ingesting cocaine and smoking marijuana on the night in question, but denied that it affected his ability to remember things. He further admitted not contacting the authorities regarding the fire. Laurie also testified that he had not been charged with any crimes relating to the night in question.

Patricia Brasil testified that in September 1997, she was living in Cicero at 2626 South 59th Avenue. At the time, she owned a black Nissan. Brasil testified that she saw it around 10 p.m. the evening of September 14, 1997, in her garage, and that it was missing the following morning. Two days later she received a telephone call from the Oak Park police informing her the vehicle had been found on Lombard Avenue in Oak Park. After retrieving the car, Brasil discovered that the car radio, a pager and compact discs had been removed from it.

Christopher Wilson, who was incarcerated at the time of defendant's trial on a felony retail theft conviction, testified that he was a friend of defendant's. Wilson stated that in November 1997, he had a conversation with defendant, during which he asked defendant why he had not seen him in several days. Defendant informed Wilson that he and Dicorpo had started the fire that had killed the five Poull children.

Assistant State's Attorney David Sabatini testified that on December 23, 1997, he interviewed defendant at the Cicero police station. Sabatini read defendant his *Miranda* rights, which defendant said he understood. After defendant told Sabatini that he and Dicorpo set the fire, defendant agreed to give a written statement. Sabatini printed out a four-page handwritten statement, which he then read to defendant. The contents of this statement have previously been set out. Defendant signed the first and last pages of the statement and initialed every page and every correction. The statement was admitted into evidence. Sabatini testified that defendant was nervous, but alert, during the interview and knew he was arrested because of the fire that killed the children.

James Leahey, a fire inspector with the Illinois State Fire Marshal's office, testified that he investigated the cause of the fire in question. Based upon the presence of extensive burn patterns, Leahey concluded that the fire had originated in the area of the first-floor back porch and had been caused by the application of an open flame to some ordinary combustibles and building materials. Leahey also testified that an accelerant-sniffing dog was brought in and that it did not alert investigators as to the presence of any accelerants on the premises. Chemical analysis tests on debris from the fire scene did not show the presence of any accelerants. On cross-examination, Leahey admitted that if an accelerant were used to start a fire, it could be totally consumed in the fire and leave no trace.

The parties stipulated that a burned-up lighter fluid can and a lighter recovered from the scene had no latent fingerprints suitable for comparison on them. Upon admission of its exhibits into evidence, the State rested its case.

At trial, Liese, who was called to testify on defendant's behalf,

testified that she was an educational diagnostician. As for her educational background, Liese testified that she had received a bachelor's degree from the University of Illinois, a master's degree in learning disabilities from Northwestern University in 1974, and had completed her course work on her doctorate in educational psychology at the University of Chicago and was writing her dissertation.

Regarding her work experience, Liese stated that after receiving her master's degree, she had worked for a short time as a diagnostician at Mercy Hospital, where she evaluated children and adults for learning disabilities. Liese then worked for three years at a private therapeutic school with severely emotionally disturbed and learning disabled children. Following this position, Liese entered private practice, where she was a therapist with children and adults having learning problems. Liese subsequently joined the staff at Northwestern Hospital, where she was eventually put in charge of all inpatient and outpatient evaluations. During the time of her employment with Northwestern Hospital, Liese also worked in private practice as a diagnostician, evaluating children and adults who were experiencing learning problems. Liese testified that she had also served as a special education consultant to the Northwestern Law School's legal aid clinic, where she taught law students to advocate for special education rights for public school students.

Liese stated that she had supervised psychologists and psychiatrists, who were on rotation at the University of Chicago in the child and adolescent psychiatry department, in evaluating students with learning disabilities and emotional and cognitive deficits. Liese stated further that she had been working full-time for about 19 years evaluating and assessing people for learning disabilities.

After defense counsel tendered Liese as an expert in the fields of educational evaluation, learning disability consulting and intelligence measurement, the State established that Liese had no forensic clinical psychological training and was not an expert in the field. Liese admitted that she was not licensed by the State of Illinois to do clinical psychology and stated that her research with respect to her master's and doctoral work dealt with gender-related differences in the development of young children. Liese stated that she was an expert in the field of learning disabilities, but not an expert in forensic psychology. With respect to the work she had done at Northwestern University, Liese testified that none of it related to whether someone could understand *Miranda* warnings. Liese also stated that she had previously testified only twice as an expert in court and this concerned whether someone understood *Miranda* rights. Liese testified that a person could be placed in a special education class because of

behavioral and emotional problems. Liese did not testify during the *voir dire* at trial as to her background in administering I.Q. tests.

After both sides completed the *voir dire*, the jury and Liese were excused from the courtroom. Defense counsel then said, "I think she has been qualified as having knowledge superior to that of the triers of fact in the field of educational evaluation, intelligence measurement and other areas of education measurement and that's all that the case law requires."

The State first objected that Liese was not qualified as an expert in educational evaluation. The following was then stated:

"THE COURT: Let me just stop you for a minute because that's what I thought this witness was being offered for but [defense counsel] is not indicating that he is offering her for that as an expert. He is offering her as someone who has an education in this field that may be beyond the normal course.

[THE PROSECUTOR]: There hasn't been any showing that any information or knowledge of education, training that she has will in any way assist this trier of fact in assessing the intelligence level of this defendant. There has been no showing whatsoever. There has been no showing that she's done any type of analysis testing, surveying, processing, intellectual surveys. *** To hold herself out to this jury that she is an expert in intelligence measurement *** [w]hich goes to the core of [defense counsel's] defense that this man did not understand his Miranda Warnings, the purpose of Mr. Sabatini, what a lawyer is, all of that cross examination that we listened to last Friday afternoon.

THE COURT: But he is not offering her as an expert in that.

[THE PROSECUTOR]: Well, then what is she doing here?

THE COURT: He is offering her as a witness who has conducted some sort of interviews with this particular individual, and based on her educational background, what she believes, but I don't think she is being offered as an expert. There is a difference.

[THE PROSECUTOR]: What she believes about his educational level is immaterial.

\* \* \*

[DEFENSE COUNSEL]: Her education and training after twenty years of experience in evaluating children and young adults as to their educational abilities and her course work qualified her to have a superior knowledge in the field of measuring educational levels, reading abilities, understanding of reading abilities, that is superior to the average person who would comprise the trier of fact, that being the jury and that, I believe, is all that's required of a person to be an expert.

THE COURT: Well, no, see I don't agree with that. That's where

you have lost me. I don't think there is a basis right now for her to be offered as an expert in these fields as far as this criminal statement and these Miranda Warnings. She has no background in psychology. She has no background in clinical psychology. She has no background in forensic clinical psychology. She is not a licensed practitioner of psychology within the State of Illinois, so those areas she certainly can't be offered as an expert in any of those areas.

[DEFENSE COUNSEL]: I am not—

THE COURT: I am trying to carve out an opportunity for your witness to testify based on a conversation she may have had with [defense counsel][sic], but I don't believe that she can be presented to this jury as an expert. I don't think she can be presented to this jury much more than what you have presented, that's who she is, and she is giving basically a lay opinion, based on her education but not an expert opinion because I don't believe that there is sufficient evidence to support her giving that opinion. I do believe you have a right to call her, but under certain parameters."

The State objected to Liese's testifying as an expert. Finding that Liese was not qualified to testify as an expert in the fields advanced by defense counsel, the trial court allowed her to testify as a layperson. Liese was permitted to testify that she had given defendant a series of standardized tests. She "evaluated his intelligence, his ability to problem solve, think and process information. *** [She] evaluated his memory in terms of his short-term memory and long-term memory, *** in terms of how he processes information through his ears ***." She also testified that she measured "his verbal comprehension ability, *** his perceptional organization, *** his freedom from distractibility, *** his ability to use global reasoning, his ability to discern essential from non-essential details, his ability to use divergent thinking, conceptualize verbal concepts." On redirect, Liese testified, "I gave him a number of vocabulary measures, both receptive and expressive. I had him define vocabulary terms[.] *** I had him read words, read words with understanding, read sentences with understanding and all of those scores were consistently the same." Liese concluded that defendant's ability to understand spoken words was at a second- to third-grade level. Liese was precluded from testifying to the actual scores defendant obtained on the tests, his I.Q. and his reading level. Defense counsel told the trial court that he was not seeking to introduce Liese's testimony as to the level of the language used in the *Miranda* warnings.

On cross-examination, Liese testified that the tests she normally administered were not in a forensic setting and were not given to inmates. She further testified that she did not normally test people for

the purposes of testifying in court and that people being tested who had been charged with a crime might have a motivation to malinger. On redirect examination, Liese testified that by giving a variety of different tests when evaluating a defendant's vocabulary, the administrator of the tests can get "consistency of cross results," which would control possible malingering. Liese also stated that she did not observe any malingering on defendant's part with respect to his test results.

After the defense rested, the State called Dr. Fauteck in rebuttal to testify as an expert in the field of forensic psychology. Dr. Fauteck testified that in April 1999, he examined defendant for the purpose of determining defendant's intellectual functioning. During the examination, Dr. Fauteck spoke with defendant and gave him a series of tests. Dr. Fauteck concluded that defendant did not have any substantial impairment in his attention concentration and memory. In Dr. Fauteck's opinion, defendant had not been forthcoming about his intellectual abilities, and he concluded that defendant's overall functioning was at the low average range. He testified that defendant's I.Q. had been measured several times and that the results were between 68 and 72, which were consistent with Liese's testimony at the motion to suppress. Dr. Fauteck testified further that defendant had mentioned in passing that he had some coaching on how to "act crazy" for examiners. With respect to the statement defendant gave police, Dr. Fauteck was of the opinion that defendant would have had "no difficulty" understanding the statement if it were read to him.

After hearing closing arguments and being instructed as to the law, the jury found defendant guilty of six counts of first degree murder, burglary, arson and aggravated arson. Defendant was sentenced and this appeal followed.

## ANALYSIS

### I. Defendant's Expert

Defendant first contends that the trial court erred in not allowing Liese to testify as an expert at his trial. He argues this refusal denied him an opportunity to contest the reliability of his confession. He asserts that Liese's education and practical experience in measuring intellectual functioning and learning levels in both children and adults afforded her the specialized knowledge sufficient to justify qualifying her as an expert in educational assessments.

■ The determination as to whether an individual is an expert on a particular subject is within the trial court's sound discretion. *People v. Miller*, 173 Ill. 2d 167, 186 (1996). Absent an abuse of discretion, that determination will not be reversed on appeal. *People v. Eyler*, 133 Ill. 2d 173, 212 (1989). It is proper to allow a person to testify as an

expert if the experience and qualifications of that person give him or her knowledge that is. not common to laypersons and where the testimony will aid the trier of fact in reaching its conclusions. *Miller*, 173 Ill. 2d at 186. There is no precise requirement as to how an expert acquires skill or experience. *People v. Novak*, 163 Ill. 2d 93, 104 (1994). The expert may gain his or her knowledge through practical experience, scientific study, education, training or research. *Miller*, 173 Ill. 2d at 186. The burden is upon the proponent of the expert's testimony to establish the qualifications of the expert witness. *Novak*, 163 Ill. 2d at 104.

We note that at trial, defense counsel offered Liese as a purported expert in the fields of educational evaluation, learning disability consulting and intelligence measurement. On appeal, defendant only contests the trial court's ruling with respect to her ability to testify as an expert in the field of educational assessments. Defendant argues that he was prejudiced by the trial court's refusal to allow Liese to testify as an expert. He asserts that because Liese was precluded from testifying as to the results of the tests she had administered and the readability level of his confession, he was deprived of his right to contest the reliability of his confession. See *People v. Jefferson*, 184 Ill. 2d 486, 498 (1998).

The record shows that defense counsel's *voir dire* of Liese at trial was markedly less extensive than that conducted at the motion to suppress. The record supports the trial court's finding that Liese's credentials, as set forth in the *voir dire* at trial, did not qualify her as an expert on the measurement of intelligence or on the "readability" of either the *Miranda* warnings or the statement itself. The State argues that Liese's *voir dire* similarly supports the trial court's finding that Liese was not an expert in the field of educational assessment. In the alternative, the State, both at trial and on appeal, argues that Liese's "educational assessment" of defendant was not relevant to the issues in this case. It notes that defense counsel did not attempt to use Liese's testing at trial to question whether defendant could understand the *Miranda* warnings. As to the "readability" of defendant's statement, the State and the trial court noted that it was uncontroverted that the statement was written by an assistant State's Attorney, not defendant, and that the statement was read to defendant.

■ We agree with defendant that the trial court erred in not allowing Liese to testify as an expert in educational assessments. It is true that much of Liese's education and work experience, such as her work with emotionally disturbed children and consulting with Northwestern Law School's legal clinic, is unrelated to educational assessments. However, Liese testified at trial that for 19 years, she had evaluated

and assessed people for learning disabilities. Clearly, after 19 years of such work, Liese possessed knowledge and experience beyond that of a layperson with respect to educational assessments.

Despite the presence of an error at trial, a criminal conviction may still be affirmed where "the reviewing court is able to conclude, upon examination of the entire record, that the error was harmless beyond a reasonable doubt." *People v. Howard*, 147 Ill. 2d 103, 148 (1991). "In order for an error to be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction." *People v. St. Pierre*, 122 Ill. 2d 95, 113-14 (1988).

Although Liese was precluded from testifying as to the readability level of defendant's statement and his test scores, she was permitted to testify that defendant's spoken vocabulary was that of a second- or third-grader. In reliance upon this testimony, defense counsel challenged the jurors during closing argument to read defendant's statement and determine for themselves whether a person with defendant's mental capacity would be able to understand the document if it were read to him. The jury members had defendant's statement with them during their deliberations and this was the best evidence upon which to make a determination as to whether the content of the statement was provided by defendant or Sabatini. Having heard Liese's testimony regarding defendant's diminished vocabulary level and defense counsel's closing argument, the jury was keenly aware that the reliability of defendant's statement was at issue. Moreover, even if Liese had been permitted to testify as an expert, it would not be proper for the jury to give her "expert" testimony more weight than her layperson testimony. *People v. Cloutier*, 156 Ill. 2d 483, 508 (1993). The court in *Cloutier* relied upon the committee comments to Illinois Pattern Jury Instructions, Criminal, No. 3.18 (3d ed. 1992), "Weighing Expert Testimony," which recommend that no instruction be given on this subject. Finally, given the overwhelming evidence in support of defendant's conviction, which included the testimony of Peter Fisher and Jason Laurie, both of whom were with defendant on the night in question, we find beyond a reasonable doubt that the trial court's failure to allow Liese to testify as an expert did not contribute to defendant's convictions.

## II. Improper Rebuttal Testimony

Defendant contends next that he was denied a fair trial because the State was permitted to present the rebuttal expert testimony of Dr. Fauteck. Defendant concedes that his trial counsel's only objection to Dr. Fauteck's testimony concerned his opinion that defendant was

capable of understanding the confession when it was read to him. He did not object to Dr. Fauteck's testimony regarding defendant's intellectual functioning or possible malingering. We choose to address this issue because it arguably implicates whether defendant received a fair and impartial trial. *People v. Miller*, 302 Ill. App. 3d 487, 495 (1998).

■ Rebuttal evidence is that which is offered in order to explain, repel, contradict or disprove evidence presented by the opposing party. *People v. Robles*, 314 Ill. App. 3d 931, 937 (2000). It is left to the sound discretion of the trial court whether to allow rebuttal evidence, and absent a clear abuse of that discretion resulting in a manifest injustice to the defendant, the trial court's determination will stand. *People v. Thomas*, 217 Ill. App. 3d 698, 703 (1991).

Defendant argues that because the trial court precluded Liese from testifying about her findings with respect to his intellectual functioning, Dr. Fauteck's findings relating to defendant's I.Q. and that defendant would have no problem understanding the statement attributed to him should have also been precluded. See *People v. Quick*, 236 Ill. App. 3d 446 (1992) (finding error where the defendant was not allowed to testify about out-of-court statements, but the State was allowed to present rebuttal testimony regarding the same testimony).

As to defendant's argument that Dr. Fauteck should not have been allowed to testify as to defendant's I.Q., defense counsel elicited this testimony on cross-examination. As a result of this questioning, the jury was advised that defendant's I.Q. had been measured as being between 68 and 72. This evidence was consistent with Liese's testimony at the motion to suppress. Not only was this testimony not objectionable, from the standpoint of the defense, it was desirable.

■ At trial, defendant presented Liese's testimony that his spoken vocabulary was at a second- or third-grade level. The purpose of this testimony was to cast doubt upon the reliability of defendant's statement. In response, the State presented the expert testimony of Dr. Fauteck, who, because of his background in forensic clinical psychology, was permitted to testify that defendant had the intellectual capacity to understand his statement to police. Dr. Fauteck's testimony was proper to rebut Liese's testimony.

Defendant further argues that Dr. Fauteck's testimony that defendant was malingering was improper because it failed to rebut any evidence presented by defendant and, instead, served only to foster the jury's disdain for him. However, Liese testified that she did not observe malingering in the test results that she had obtained. Further, Dr. Fauteck's testimony that defendant was malingering was proper to explain that Liese's conclusion as to defendant's low vocabulary level may have been erroneous. Therefore, the rebuttal testimony was proper.

### III. Trial Court's Failure to Hold a *Krankel* Hearing

Defendant next contends that the trial court erred in failing to *sua sponte* order a hearing into possible neglect of defendant's case on the part of defense counsel. In support, defendant alleges that his trial attorney was possibly incompetent in that: (1) he was unsuccessful in subpoenaing a fire investigator; (2) he advanced a theory of defense that Anthony Poull may have been responsible for the deaths; (3) he failed to object to admission of gruesome photographs of the burned children; (4) immediately prior to trial, he told the trial court he did not have a copy of the indictment; (5) he accepted a firefighter as a juror; (6) in closing argument, he conceded that the evidence supported a conviction for burglary; and (7) he told the jurors that some of the delays in the trial were caused by his incompetence, but they should not hold this against defendant. Defendant argues that this court should remand his case to the trial court for a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), to determine whether defense counsel provided ineffective assistance. In her reply brief, appellate counsel acknowledges that defendant "has not alleged that he has received ineffective assistance of counsel under the *Strickland* standard." At oral argument, appellate counsel acknowledged that she made a strategic decision to rely upon the holding in *Krankel* rather than raise the issue of trial counsel's alleged incompetence directly.

In *Krankel*, after being convicted of burglary, the defendant filed a *pro se* motion for a new trial alleging, *inter alia*, ineffective assistance, based upon trial counsel's failure to contact an alibi witness and failure to present an alibi defense. On appeal, the parties agreed that new counsel should have been appointed to represent the defendant on his *pro se* motion, and the supreme court remanded the case for the appointment of new counsel to represent the defendant at a new hearing on his motion. *Krankel*, 102 Ill. 2d at 189.

Defendant acknowledges that the issue as to whether the trial court was obligated to appoint new counsel to represent a defendant on a claim of ineffective assistance typically arises where the defendant has filed a *pro se* motion with the trial court. Defendant did not raise the issue of defense counsel's competence at the trial court level, but argues that fact is not fatal to his request for a hearing.

In support, he relies upon *People v. Williams*, 224 Ill. App. 3d 517 (1992), where defense counsel presented the testimony of two alibi witnesses at the defendant's posttrial motion for a new trial. After hearing the witnesses' testimony, the trial court denied the defendant's motion for a new trial, finding the evidence was not newly discovered. On appeal, the defendant argued that based upon the "readily apparent ineffective assistance" provided by defense counsel at the sentenc-

ing hearing, the trial court erred in not conducting an examination into counsel's performance *sua sponte*. *Williams*, 224 Ill. App. 3d at 523. This court agreed with the defendant, stating, "Where there is a clear basis for an allegation of ineffectiveness of counsel, a defendant's failure in explicitly making such an allegation does not result in a waiver of a *Krankel* problem." *Williams*, 224 Ill. App. 3d at 524. This court remanded the cause to the trial court "with directions to conduct a preliminary investigation of the matter of defense counsel's performance." *Williams*, 224 Ill. App. 3d at 524. If that investigation indicated that trial counsel may have neglected the defendant's case, the trial court was ordered to appoint new counsel to argue the defendant's claim of ineffective assistance of counsel.

The State, relying on *People v. Pecoraro*, 144 Ill. 2d 1 (1991), argues that because defendant had retained private counsel, the trial court did not have the power to alter or abrogate their attorney-client relationship.

In *Pecoraro*, both the defendant and his attorney filed posttrial motions. In the defendant's posttrial motion for a new trial, ineffective assistance was alleged. Without appointing the defendant new counsel to represent him on his motion, the trial court considered each allegation in the defendant's motion under the *Strickland* standard, and concluded he had received competent representation. Citing *Krankel*, the defendant argued that the trial court erred in not appointing him new counsel to argue his posttrial motion. In addressing this claim, the supreme court stated:

> "Unlike *Krankel*, where defendant was represented by an appointed public defender at both trial and post-trial motions, defendant Pecoraro retained private counsel to represent him at trial and in post-trial motions. It was not within the trial court's rubric of authority to advise or exercise any influence or control over the selection of counsel by defendant, who was able to, and did, choose counsel on his own accord. (*People v. Walsh* (1963), 28 Ill. 2d 405, 409.) Moreover, the trial judge could not force defendant to retain counsel other than that chosen by defendant. (*People v. Johnson* (1979), 75 Ill. 2d 180, 185.) Defendant and his counsel were the only parties who could have altered their attorney-client relationship. Defendant could have retained other counsel to represent him prior to the hearing of his post-trial motions." *Pecoraro*, 144 Ill. 2d at 15.

The court also stated that "*Krankel* is a fairly fact-specific case, and the circumstances in the case at hand, where defendant retained his own private counsel and did not request that he be represented by other counsel, do not warrant the application of *Krankel*." *Pecoraro*,

144 Ill. 2d at 15. The *Williams* case was decided three months after the *Pecoraro* case, but does not cite to it.

■ In the instant case, unlike in *Krankel* and *Pecoraro*, there is no indication in the record that defendant was dissatisfied with his representation, either by defendant's statements in open court or via a posttrial motion. Furthermore, unlike in *Williams*, here, the trial court was not presented with evidence that trial counsel was neglectful in presenting witnesses or putting on a defense. See *Williams*, 224 Ill. App. 3d at 524. Similarly, the facts of the instant case are inapposite to those in *People v. Hayes*, 229 Ill. App. 3d 55, 65 (1992), which held that where a retained defense attorney did not understand the law of insanity and did not know who had the burden of proof on the issue, a trial court must "protect [the] defendant."

The record in this case is as developed as it is ever likely to be concerning the seven alleged bases for investigating whether trial counsel was ineffective. Under the facts in *Krankel* and in *Williams*, the trial court should have asked trial counsel why they did not call the available alibi witnesses. In *Hayes*, the trial court should have ascertained whether trial counsel's ignorance of the law on the insanity defense impacted the trial court's finding of guilt. None of the seven alleged bases for investigating whether trial counsel was effective rise to the level of depriving defendant of a defense.

In the context of *Krankel*, this court has stated that, "Ordinarily, a trial court should not be placed in a position of having to 'second-guess' defense counsel strategy. This is especially true when counsel is privately retained." *People v. Gillespie*, 276 Ill. App. 3d 495, 502 (1995). Since a clear basis for an allegation of ineffectiveness of counsel does not exist, we cannot find that the trial court erred in failing to *sua sponte* examine whether defendant was provided with effective assistance of counsel. See *People v. Ephraim*, 323 Ill. App. 3d 1097, 1114 (2001).

### IV. Improper Consecutive Sentences

■ Defendant's last contention is that the trial court erred in imposing consecutive sentences under section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1996)), because the court improperly relied upon the deaths of the victims to trigger consecutive sentences.

Section 5—8—4(a) provides:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted

severe bodily injury, or where the defendant was convicted of a violation of Section 12—13, 12—14, or 12—14.1 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively." 730 ILCS 5/5—8—4(a) (West 1996).

After sentencing defendant and his codefendant to natural life in prison, the trial court stated:

"As to the count of aggravated arson, which is a Class X felony, which there is also a finding of guilty, and that, being a Class X felony attach to this murder conviction, carries with it, under Illinois Compiled Statutes 730/5—8—4, Section A, it is mandatory that under these circumstances that sentence runs [*sic*] consecutive to the murder sentence."

Defendant does not contest the sufficiency of evidence in support of his aggravated arson conviction. Rather, he argues that because the severe bodily injuries suffered by the victims were not proximately related to the Class X felony of aggravated arson, the trial court erred in sentencing him to a consecutive sentence on that conviction. See *People v. Whitney*, 188 Ill. 2d 91 (1999). He also argues the court's imposition of consecutive sentences amounts to an improper double punishment, since he was punished twice for causing the death of the Poulls. See *People v. Biggs*, 294 Ill. App. 3d 1046, 1053 (1998). These arguments have been considered and rejected by this court in *People v. Wilder*, 325 Ill. App. 3d 987 (2001), *People v. Sergeant*, 326 Ill. App. 3d 974 (2001), *People v. Carney*, 327 Ill. App. 3d 998 (2002), and *People v. Sample*, 326 Ill. App. 3d 914 (2001). In all these cases, this court held that the murder of a victim may be the basis for the severe bodily injury requirement of section 5—8—4(a). In *Carney* and *Sample*, this court rejected the argument that a mandatory consecutive sentence imposed pursuant to section 5—8—4 amounts to an improper double enhancement. *Carney*, 327 Ill. App. 3d at 1003-04; *Sample*, 326 Ill. App. 3d at 930-31. The *Sample* court also held that where a general verdict of murder is returned, as here, the sentence for the murder count is properly imposed on the count alleging intentional or "knowing" murder rather than the felony murder count. *Sample*, 326 Ill. App. 3d at 928-29. We agree with the reasoning in all these cases. Consequently, the sentence for aggravated arson was appropriately ordered to be served consecutively to defendant's sentence for murder.

Finally, defendant relies upon the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and contends that the trial court erred in ordering that his aggravated arson sentence be served consecutively to his other sentences. He argues that the trial court's finding that his offenses were committed as part of a single course of conduct during which there was no

substantial change in the nature of the criminal objective should have been decided by the jury at trial, rather than the trial court at sentencing.

The Illinois Supreme Court in *People v. Wagener*, 196 Ill. 2d 269 (2001), held that *Apprendi* does not apply to consecutive sentences. Thus, defendant's argument fails.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL, P.J., and GREIMAN, J., concur.