2019 IL App (1st) 180500-U

No. 1-18-0500

December 31, 2019

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 11155 |
| | ) | |
| IRVING DEPAZ, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WALKER delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's robbery conviction is affirmed where the trial court's error under Illinois Supreme Court Rule 431(b) did not prejudice defendant, and defense counsel's ineffectiveness claim did not require an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 2    Following a jury trial, defendant Irving Depaz was convicted of robbery and sentenced to eight years' imprisonment. Defendant argues on appeal that (1) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) in a closely-balanced case, and (2) this

court should remand for a posttrial hearing on defense counsel's claim of ineffectiveness because the trial court did not conduct an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). For the following reasons, we affirm.

¶ 3                                        BACKGROUND

¶ 4      Defendant and Phillip Forte[1] were indicted on one count of robbery (720 ILCS 5/18-1(a) (West 2016)), two counts of aggravated battery of a merchant (720 ILCS 5/12-3.05(d)(9) (West 2016)), and one count of unlawful restraint (720 ILCS 5/10-3(a) (West 2016)). The State proceeded on the robbery count.

¶ 5      At the beginning of *voir dire*, the trial court admonished the venire that defendant was presumed innocent of the charge and was not required to present any evidence on his behalf. It then asked, "Does anybody have any problems understanding that Constitutional principle *** please raise your right hand," and, "Does anybody have any qualms or problems about applying *** that anybody charged in a criminal case is presumed to be innocent of the charge against him, please raise your hand." No members of the venire responded.

¶ 6      The trial court next explained that the State had the burden of proving defendant guilty beyond a reasonable doubt, and asked if anyone had "any problems or qualms" with that principle. The court also stated that criminal defendants have a right to choose whether to testify, and that if defendant decided not to testify, "no inference whatsoever c[ould] be drawn from his silence." The court asked if anyone did "not accept that principle" or had "any qualms or problems" applying it. No members of the venire responded.

---

[1] Forte pled guilty to one count of aggravated battery and was sentenced to 40 months' imprisonment. He is not a party to this appeal.

¶ 7    At trial, Erika Leyva testified that on July 18, 2017, she was working at Walgreens on 26th Street and Albany Avenue with her manager, Isabel Villarreal. At around 11 p.m., a tall African American man wearing a purple shirt and a short Hispanic man wearing a hat entered the store. Defendant carried a black duffle bag. In court, Leyva identified defendant as the Hispanic man.

¶ 8    Leyva was approximately seven feet away when the men began "shoving" merchandise into the duffle bag. Walgreens policy dictates that if an employee suspects shoplifting, she can approach the suspect "at arm's length or further." When Leyva approached the men, they both pushed her and the African American man punched her left eye. The men walked away, but then defendant came back towards Leyva. After the men left, a cut on Leyva's eye started bleeding. The police were called, and they told Leyva to contact them if she saw the men again. The State published surveillance video from Walgreens, which is included in the record on appeal. Leyva testified that the video shows defendant pushing her, heading towards the exit, and walking back towards her.

¶ 9    Later that night, Leyva saw the men near Cermak Road and Washtenaw Avenue, so she contacted the police. Leyva went to the police station, where officers photographed her facial injury and showed her a suitcase full of products that she identified as taken from Walgreens. In court, she identified the photographs of her face, which depicted "bruising and redness" where she was hit, and of the suitcase containing Walgreens products. Leyva went to Walgreens with Villarreal and rang in the products found in the suitcase to confirm they were taken from the store.

¶ 10    On cross-examination, Leyva clarified that Walgreens policy allows employees to approach suspected shoplifters without getting too close, making accusations, or confronting them. She approached the men from a "reasonable" distance, calling them names and cursing. After the

men pushed and punched Leyva, she threw a bottle of lotion at the African American man. The men did not try to take her phone or go through her pockets, nor did they show her a weapon.

¶ 11    On redirect examination, Leyva testified that she did not immediately call the police after the men left because she "just wanted to get back to work." On recross examination, Leyva stated that she did not hesitate to call the police when she saw the men on the street.

¶ 12    Villarreal testified that while in the Walgreens office on the date of the incident, she heard the code used to alert employees about a potential shoplifter, looked at the surveillance video, and observed two men enter the store, one of whom she identified in court as defendant. She ran towards the store's cosmetic area. Both men pushed Leyva, and the African American man also punched her. The men then started to leave, but defendant returned and hit Leyva. After the men left, Villarreal called the police. Later, she went to the police station and identified items taken from the store. The following day, she returned to Walgreens and confirmed the items had been taken.

¶ 13    On cross-examination, Villarreal testified that she only saw the men take the items in the surveillance video, that she was several feet from the men when they pushed Leyva, and that she did not tell officers that Leyva fell to the ground.

¶ 14    Chicago police officer Joseph Mulchrone testified that he responded to a call at the Walgreens on July 18, 2017. Later that evening, he found defendant and Forte with a suitcase containing hand creams and lotions and arrested them. Leyva and Villarreal identified the contents of the suitcase as items taken from the Walgreens. He accompanied the women to Walgreens to confirm that the items came from the store.

¶ 15    On cross-examination, Mulchrone testified that Leyva called to report she saw defendant and Forte on the street, and did not state whether she found them by "coincidence or on purpose."

¶ 16    Defendant testified that he has a drug problem and prior convictions for attempt possession of a stolen motor vehicle and retail theft. On July 18, 2017, defendant and Forte went to Walgreens "with the intention of stealing" to support his drug addiction. Once inside, they started "throwing" skincare products into a duffle bag. Leyva approached them and said she was recording them. When defendant tried to leave, Leyva pushed him, causing defendant's hat and some of the items in his bag to fall on the ground. Defendant continued towards the exit when he realized he did not have his hat, and turned around to find it. When he could not find the hat, he left the store and proceeded to Washtenaw and Cermak. Defendant denied initiating contact with anyone inside the store, including Leyva.

¶ 17    The court denied defense counsel's request to permit defendant to enter the gallery to view the surveillance video. Instead, counsel played the video for defendant while defendant was in the witness box, and asked defendant questions about it. Throughout this portion of the examination, defendant identified people and events in the video, but repeatedly claimed that he could not see certain details because he "can't see that far." Specifically, defendant stated he could not see the timestamp on the screen or items in Leyva's hand. Defendant acknowledged the video shows someone's hand pushing Leyva, but denied it was him.

¶ 18    On cross-examination, defendant acknowledged that Leyva was shoved before he left the store and had her glasses knocked off her face. On redirect examination, defendant stated that he did not deny stealing items from Walgreens.

¶ 19    Chicago police officer Jesus Garcia testified that on July 18, 2017, he was called to the Walgreens. Leyva informed Garcia that she had been punched by individuals who committed theft as they tried to exit the store. Leyva seemed upset and had red eyes.

¶ 20    The trial court instructed the jury as to both robbery and retail theft, and the jury found defendant guilty of robbery. Defense counsel filed a motion for a new trial, arguing in relevant part that the defense was hampered because defendant was not allowed to approach the video screen despite his poor eyesight. After the trial court noted defense counsel's failure to move the screen closer to defendant, the following colloquy occurred:

"[DEFENSE COUNSEL]:  *** The TV screen was in the center of the gallery so that the trier of fact, the jury, would be able to see.  There is a defined length that that cord will go and Mr. Depaz—

THE COURT:  I'm sorry.  You think this is the only cord in the world—

[DEFENSE COUNSEL]:  No, your Honor.  So then perhaps I *** will allege my own ineffectiveness ***."

¶ 21    The trial court denied defendant's motion, stating:

"[A]bout the screen, my understanding was there [were] multiple times that the video had been shown. So looking at the totality of facts, I dispute whether Mr. Depaz was denied due process. There's no showing what his eyesight is and there's no recommendations by any optometrist or ophthalmologist either."

¶ 22    After a hearing, the trial court sentenced defendant to eight years' imprisonment. Defendant filed a motion to reconsider his sentence, which the court denied.

¶ 23                                    ANALYSIS

¶ 24     On appeal, defendant first argues that we should grant a new trial based on the trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The State concedes the error but contends that a new trial is not necessary because the evidence against defendant was not closely balanced.

¶ 25     The parties agree that defendant forfeited review of this issue by failing to raise it in the trial court and by not including it in his posttrial motion. In order to preserve a claim of error for appeal, a defendant must object both at trial and in a posttrial motion. *People v. Belknap*, 2014 IL 117094, ¶ 66 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Because defendant did not take either step, he has forfeited review of this claim. See *id.*

¶ 26     However, defendant contends that we may review the issue for plain error. The plain-error doctrine is a "narrow and limited exception" to the general forfeiture rule. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). It allows this court to review a forfeited claim when a clear or obvious error occurred, and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Because the second prong is generally not applicable to Rule 431(b) violations (*People v. Sebby*, 2017 IL 119445, ¶ 52), defendant asserts the first prong applies. Our initial inquiry is to determine whether the trial court erred. *Id.* ¶ 49.

¶ 27     Rule 431(b) mandates that the trial court ask every prospective juror whether he or she "understands and accepts" four fundamental principles:

"(1) that the defendant is presumed innocent of the charge(s) against him ***; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his *** own behalf; and (4) that if a defendant does not testify it cannot be held against him ***." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 28 Strict compliance with these admonishments is required. *People v. Wilmington*, 2013 IL 112938, ¶ 32; *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). Whether the trial court's admonishments strictly complied with Rule 431(b) is a matter of law which we review *de novo*. *Belknap*, 2014 IL 117094, ¶ 41.

¶ 29 Here, we agree with the parties that the trial court did not expressly ask the prospective jurors whether they both understood and accepted defendant's presumption of innocence, the burden of proof, that defendant was not required to present any evidence, or defendant's right not to testify. Instead, the record demonstrates that the trial court improperly asked if anyone had any "problems" or "qualms" with each proposition. Thus, the court erred in its Rule 431(b) admonishments. See *Sebby*, 2017 IL 119445, ¶ 49 (finding "clear error" where the trial court asked jurors whether they "had any problems with" or "believed in" the Rule 431(b) principles).

¶ 30 Defendant asserts the evidence was closely balanced as to whether he committed robbery. Whether the evidence was closely balanced "depends upon the quantum of evidence presented by the State against the defendant." *People v. Herron*, 215 Ill. 2d 167, 193 (2005). On review, we must conduct a qualitative, commonsense evaluation of the evidence based on the totality of the circumstances. *Sebby*, 2017 IL 119445, ¶ 53. The evaluation deals not with the sufficiency of close

evidence, but with the closeness of sufficient evidence, and requires us to assess the evidence with respect to the elements of the offense and the witnesses' credibility. *Id.* ¶¶ 53, 60.

¶ 31    In this case, the evidence was not closely balanced as to whether defendant committed robbery. To convict defendant, the State was required to prove that he knowingly took property from the person or presence of another by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-1(a) (West 2016). "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d 307, 338 (1995). Here, defendant acted with Forte, and thus, to determine whether evidence is closely balanced, we may also consider Forte's involvement in the offense. See *id.*

¶ 32    Leyva testified that she was standing approximately seven feet from the men as they took items off the store's shelves. Both she and Villarreal testified that defendant and Forte pushed Leyva, and that Forte punched Leyva in the eye prior to leaving the store with the items. Photographs officers took of Leyva after the incident confirm that she had a cut on her eye. Moreover, the surveillance video shows the men pushing Leyva. Taken as a whole, this evidence is not closely balanced with defendant's testimony that he did not initiate contact with Leyva during the incident.

¶ 33    Nevertheless, defendant contends that he did not take the items from Leyva's presence because she was seven feet from him. "The presence requirement of the robbery statute relates to the property taken," which "must have been in the presence or control of the victim." *People v. Smith*, 78 Ill. 2d 298, 303 (1980). However, robbery is not "limited to the removal of the property from the *** *immediate presence* of the owner, possessor or custodian." (Emphasis added.) *Id.* at

302. Rather, robbery occurs "when the property taken was sufficiently within the possession or control of the victim so that the force or threat of force caused the victim to part with the property against his will." *People v. Smith*, 2019 IL 123901, ¶ 27.

¶ 34 Here, Leyva, Villarreal, and defendant all testified that defendant took the items while Leyva was in the immediate area of both defendant and the merchandise, and surveillance video shows Leyva being pushed prior to defendant leaving the store with the items. Thus, defendant's argument that Leyva was not in his presence at the time of the taking fails. See *id.*

¶ 35 Defendant also asserts that "any force stemmed from the escape, not the taking," and therefore, the State failed to prove the force element of robbery. He adds that because he testified that he did not use force, and the surveillance video does not establish how Leyva fell, the issue depends on the credibility of the witnesses. "[E]ven if the initial taking is accomplished without force, the offense is *** robbery if the departure is accompanied by force." (Internal quotation marks omitted.) *People v. Perea*, 347 Ill. App. 3d 26, 43 (2004) (discussing element of force in relation to armed robbery). Leyva and Villarreal testified that defendant and Forte pushed and punched Leyva prior to leaving the store with the stolen items. Surveillance video showed Leyva being pushed near the store's exit. To contradict the State's case, defendant offers only his testimony that he did not initiate contact with Leyva and notes the lack of video evidence of him pushing her. Because the overwhelming evidence demonstrated that defendant and Forte used force against Leyva before leaving the store with the items, the evidence was not closely balanced. Therefore, defendant is not entitled to relief under the plain error doctrine.

¶ 36 Next, defendant requests remand for a posttrial hearing on defense counsel's ineffectiveness. According to defendant, counsel alleged her own ineffectiveness regarding her

failure to ensure defendant could adequately view the surveillance video at trial, and the trial court erred by not inquiring pursuant to *Krankel*.

¶ 37    In *Krankel*, the supreme court held that when a criminal defendant notifies the trial court that he believes he received ineffective assistance of counsel at trial, the court must inquire into his claim. *Krankel*, 102 Ill. 2d at 189. Until recently, this court has been divided on whether counsel's own claim of ineffectiveness requires a *Krankel* inquiry. Compare *People v. Williams*, 224 Ill. App. 3d 517, 522-24 (1992) (requiring inquiry where defense counsel alleged he would have offered testimony of other witnesses but for mistaken belief that the witness' testimony would have been excluded as hearsay), and *People v. Hayes*, 229 Ill. App. 3d 55, 61 (1992) (requiring inquiry where defense counsel admitted he incorrectly believed that the State had the burden of proving the defendant's sanity beyond a reasonable doubt), with *People v. McGath*, 2017 IL App (4th) 150608, ¶ 51 (inquiry not required absent a *pro se* posttrial claim of ineffective assistance of counsel).

¶ 38    In *People v. Bates*, 2019 IL 124143, the supreme court explained that *Krankel* only requires the trial court to make an inquiry "upon a clear claim of ineffective assistance by a *pro se* defendant or by an attorney at the defendant's direction." *Bates*, 2019 IL 124143, ¶ 33. There, the defendant's counsel claimed during a hearing on the defendant's motion for a new trial that he was surprised at the depth of other crimes evidence introduced at trial, and that he would have had that evidence tested by defense experts had he known ahead of time. *Id.* ¶ 11. On appeal, the defendant argued that the trial court should have treated his counsel's statements as an admission of neglect and conducted a *Krankel* inquiry. *Id.* ¶ 20. The supreme court disagreed, reasoning that the rule proposed by the defendant would "subject the trial court to an unworkable standard requiring that

it scrutinize every statement and action by counsel and perhaps even to inquire into privileged matters." *Id.* ¶ 32. The supreme court further reasoned an alternate holding would force trial courts "to question whether counsel's actions are strategies, which would potentially force [courts] to inquire into privileged matters and perhaps sow seeds of doubt into a defendant's mind as to a strategy to which he previously agreed." *Id.*

¶ 39 Here, defendant did not personally claim ineffective assistance, nor does the record show he directed his counsel to do so. During the hearing on defendant's motion for a new trial, the trial court questioned defense counsel about her choice to use a cord that did not allow defendant to clearly see the television screen during his examination. At that point, defense counsel stated that she would "allege [her] own ineffectiveness." Counsel's claim came entirely unprompted by defendant, and as such, following the supreme court's reasoning in *Bates*, the trial court was not required to conduct a *Krankel* inquiry. See *id.*

¶ 40                                    CONCLUSION

¶ 41 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 42 Affirmed.